UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
Lexington Division

| | | |
|---|---|---|
| VAPOR TECHNOLOGY ASSOCIATION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 5:19-cv-00330-KKC |
| U.S. FOOD AND DRUG ADMINISTRATION, et al., | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
<u>FOR PRELIMINARY INJUNCTION</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................................................... 1

FACTS ....................................................................................................................... 3

    I.   Vapor Products Provide an Alternative to Combustible Cigarettes for Existing Smokers and are an Important Public Health Harm Reduction Tool. ...................................................... 3

    II.   Unlike Cigarette Manufacturers Whose Products Were  Exempted, Vapor Product Manufacturers are Disadvantaged by the Food, Drug and Cosmetic Act, as amended by the Tobacco Control Act, Which Requires Pre-Market Tobacco Applications for All Vapor Products, Including Those Already on the Market. .............................................................. 5

    III.   Since the Deeming Rule Took Effect, Vapor Product Companies Have Been Subject To and Have Complied With an Extensive Series of FDA Regulations. ......................................... 7

    IV.   FDA Repeatedly Promised Vapor Manufacturers the "Rules of the Road," But Has Failed to Deliver a *Draft* PMTA Rule, Foundational Rules, or Clear Guidance Upon Which Vapor Manufacturers Can Rely for the Mandatory PMTA Process. .................................................. 8

    V.   Vapor Stockroom and the VTA's Other Members Justifiably Delayed Working on Their PMTAs in Reliance on FDA's Repeated Promises of Further Clarity Regarding the "Rules of the Road" for PMTAs and FDA's Public Statements and Guidance Stating that Stakeholders Would Have Until August 2022 to File Their PMTAs. ........................................................ 13

    VI.   FDA Only Published its Final ENDS PMTA Guidance on June 11, 2019, and, Therein, Materially Changed its Earlier Recommendations Regarding Critical Harmful and Potentially Harmful Constituent Testing. ................................................................................................ 14

    VII.   FDA Proposed a Twenty-Seven Month Acceleration of the PMTA Filing Deadline to Another District Court and Is Enforcing Same Without Any Advance Notice or Opportunity for Comment to VTA or Industry Stakeholders. .................................................................... 16

    VIII.   Vapor Stockroom and the VTA's Other Members Must Now Either Spend Millions of Dollars on PMTAs that They Know Will Be Incomplete by May 11, 2020, or Wait for Additional Regulations from FDA and Face Having to Shut Down Due to FDA Enforcement Action After May 11, 2020. ..................................................................................................... 19

STANDARD OF REVIEW ........................................................................................... 22

ARGUMENT .............................................................................................................. 23

    I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR ADMINISTRATIVE PROCEDURE ACT AND DUE PROCESS CLAIMS. ........................ 23

        A.   FDA Violated the Administrative Procedure Act By Superfluously Suggesting and Imposing a Grossly Accelerated PMTA Compliance Deadline Without Any Foundational Rules in Place Regarding the Submissions' Required Contents or Any Associated Notice and Comment Procedure. ................................................................................................. 24

        1.   FDA's actions were arbitrary and capricious because they failed to take into account for at least three important "aspects of the problem":  (i) vapor product manufacturers' significant reliance interests in FDA's earlier statements regarding the PMTA deadline; (ii) the impossibility of compleing any, much less "high quality"

PMTAs within a ten-month time frame; and (iii) the lack of long-promised "foundational rules" regarding the PMTA's required contents. ............................................................ 24

2.    FDA violated that APA's procedural requirements by proposing a ten-month timeframe without notice to Plaintiffs or any opportunity for public comment. .............. 38

B.    FDA Violated Plaintiffs' Fifth Amendment Due Process Rights by (i) Superfluously Suggesting the Abbreviated Ten-Month Deadline for PMTA Submissions and (ii) Failing to Give Fair Notice of What is Required to File a "High Quality" PMTA for a Vapor Product. ........................................................................................................................... 41

1.    FDA's superfluous suggestion of a ten-month deadline violated Plaintiffs' Fifth Amendment due process rights. ............................................................................................ 42

2.    FDA's failure to give fair notice of what is required for a "high quality" PMTA violates Plaintiffs' Fifth Amendment due process rights. .................................................. 47

II.    PLAINTIFFS WILL SUFFER IRREPARABLE INJURY ABSENT INJUNCTIVE RELIEF ................................................................................................................................. 50

A.    Plaintiffs Will Suffer Irreparable Injury From the Loss of Their Businesses. ........... 50

B.    Plaintiffs Will Suffer Irreparable Injury Because Sovereign Immunity Prevents Them from Ever Recovering Monetary Damages from FDA. ........................................................ 52

C.    Plaintiffs Are Suffering Irreparable Injury Through the Violation of Their Constitutional Due Process Rights. .......................................................................................... 54

III.    THE REQUESTED INJUNCTIVE RELIEF WILL NOT CAUSE SUBSTANTIAL HARM TO THIRD PARTIES OR TO FDA. ........................................................................... 54

IV.    THE REQUESTED RELIEF WILL SERVE THE PUBLIC INTEREST, INCLUDING BY PREVENTING THE "MASS MARKET EXIT" OF VAPOR PRODUCTS WHICH FDA SAID "SHOULD BE AVOIDED IF AT ALL POSSIBLE". .................................................... 57

A.    An Injunction Would Ensure Adult Former Smokers' Continued Access to a Significantly Less Harmful Alternative to Combustible Cigarettes. .................................... 57

1.    FDA itself has declared the public health threat that will be realized by the sudden removal of vapor products from the market. ................................................................ 57

2.    Independent public health experts have concluded that the ten-month PMTA deadline and FDA's failure to establish rational rules will drive vapor products from the market, adversely impact public health, and lead to serious black market consequences. 60

3.    PMTA applications have little material relevance to addressing illegal youth use of vaping products and this concern does not outweigh the "genuine risk" that former smokers will start again. ............................................................................................... 63

B.    An Injunction Would Remedy the Deprivation of Plaintiffs' Constitutional Due Process Rights. ............................................................................................................................ 65

C.    An Injunction Would Serve the Public Interest by Ensuring that FDA Complies With the APA's Requirements Before Making Determinations that Could Potentially Cost Tens of Thousands of Jobs. ................................................................................................................. 66

CONCLUSION ......................................................................................................................... 67

## INTRODUCTION

This case and this motion seek to prevent Defendants FDA and HHS from destroying an industry that is comparable in size to the U.S. steel and iron forging and commercial fishing industries: the vapor products or e-cigarette industry.  Today, the vapor products industry is facing shutdown in May 2020 due simply to the Defendants' enforcement of a grossly and arbitrarily accelerated regulatory application deadline that Defendants only recently *changed via litigation and not through any lawful notice and comment period*.  Before Defendants were in need of their convenient litigation solution, the deadline for pre-market tobacco applications ("PMTAs") for the vapor products industry stood at August 2022.  Now, instead of having thirty-seven (37) months to complete the bevy of complex, multi-year, multi-million dollar scientific studies and research required to support a PMTA, FDA is giving all vapor product manufacturers a mere ten months, after which time any company failing to have filed an application will be illegally selling products and will need to close.  Defendants' demands of a vapor products industry that, for years, has been counting on an August 2022 deadline, are simply impossible for myriad practical reasons about which Defendants either have no knowledge or which they have chosen to ignore.  Absent judicial relief, May 2020 will bring about a mass exit of vapor products from the U.S. market, the closure of thousands of businesses nationwide, and the loss of tens of thousands of jobs.

Further, as if the economic harm from such an industry-wide shutdown were not bad enough, the threatened harm to public health when the Court considers the *Defendants*' own warnings is arguably worse.  Rarely can a court review and rely upon a defendants' sworn testimony to grant the relief that a plaintiff seeks, but such is the situation here.  Just recently, FDA testified under oath that a grossly accelerated PMTA filing deadline  set only four months

1

away would lead to the "mass market exit" of ENDS products. *Plaintiffs agree.* FDA also testified that a four-month PMTA application deadline "would cause significant public health concerns." *Plaintiffs agree.* FDA further testified that "dramatically and precipitously reducing availability of ENDS products could present a serious risk that adults . . . would migrate to combustible tobacco products, even if particular ENDS products ultimately receive marketing authorization and return to the market later." *Plaintiffs agree.* Finally, FDA concluded unequivocally that "[t]his is a public health outcome that should be avoided if at all possible." *Plaintiffs agree.*

Given how certain Defendant FDA is about the imposition of a four-month deadline leading to a serious public health issue that must be avoided if at all possible, the bottom-line question for this Court is whether Defendants' arbitrarily determined ten-month deadline would prevent the "mass market exit" of vapor products and the adverse public health outcomes about which FDA starkly warns. Here, not even Defendant FDA can offer much confidence, instead merely suggesting that ten months would "at least make it *feasible* for *more* manufacturers" to comply. Putting aside for the moment the fact that, as discussed below, FDA has improperly used the litigation process to grossly alter a deadline which had been set for two years, and putting aside the fact that FDA has not even published a *draft* version of the PMTA rule with which Plaintiffs and the entire industry are supposed to comply within ten months' time, the sobering facts provided by a leading expert, and even common sense, demonstrate that it is simply not "feasible" for the vast majority of vapor product manufacturers to comply on that timeline. Absent injunctive relief, the very serious public health risks about which FDA has dramatically warned will come to pass – namely, a return to far more harmful smoking caused by

the "mass market exit" of vapor products.  Fortunately, it is possible to avoid this public health outcome that FDA said must be avoided.

Through this motion, Plaintiffs Vapor Technology Association ("VTA") and Vapor Stockroom, LLC ("Vapor Stockroom") merely seek a preliminary injunction requiring FDA to do that which it has publicly promised to do for the last two years—namely, (i) establish a proposed and final rule governing the submission of PMTAs and product standards for vapor products through a notice-and-comment rulemaking process; (ii) set a reasonable, non-arbitrary deadline for the filing of PMTAs pursuant to the final rule; (iii) refrain from taking enforcement action against vapor products on the U.S. market as of August 8, 2016, until the new deadline for filing PMTAs; and (iv) refrain from taking enforcement action based on the failure of vapor product manufacturers to submit a complete PMTA by May 11, 2020.

On balance, there is a sufficient evidentiary record to grant the Plaintiffs' requested relief and require FDA to do the same work that FDA itself has asked another district court to let it do. As explained below, Plaintiffs are likely to succeed on the merits of their statutory and constitutional claims and are likely to suffer irreparable harm absent injunctive relief.  Further, neither FDA nor third parties will be substantially harmed by a continuation of the current status quo while FDA complies with its statutorily required processes.  Rather, based on FDA's own testimony, the public interest, and particularly the public health, will be benefited.  Plaintiffs' motion for a preliminary injunction should be granted.

## FACTS

I.      **Vapor Products Provide an Alternative to Combustible Cigarettes for Existing Smokers and are an Important Public Health Harm Reduction Tool.**

Vapor devices, also known as "electronic cigarettes," "e-cigarettes," or "electronic nicotine delivery systems (ENDS)" are handheld electronic devices that are used to heat and

4852-5920-7587.1

aerosolize a liquid mixture ("e-liquid") that contains nicotine (not cannabis, THC, or any other active ingredient).  Verified Complaint ("VC"), ¶ 19.  Once the e-liquid is aerosolized, the user of the vapor device inhales the aerosolized "vapor" in a manner similar to that of inhaling actual tobacco smoke, but without the fire, flame, tar, carbon monoxide, ash, stub, or smell associated with traditional cigarettes.  *Id.*  Vapor products come in a wide variety of classifications, including pre-filled "closed systems," as well as "open systems" that the consumer must fill him- or herself with a preferred e-liquid.  *Id.*, ¶¶ 20-21.  E-liquids are sold in a variety of flavors and nicotine concentrations, including zero nicotine products, and users thus have the option to reduce their nicotine intake and/or wean themselves off of nicotine entirely.  *Id.*, ¶ 21.

Vapor products first became available in the United States in or about 2008.  *Id.*, ¶ 22.  Today, over 3 million unique e-liquids and vapor devices are registered with FDA's Center for Tobacco Products.  *Id.*, ¶ 23.  The vapor product market is highly diverse in order to meet the varied needs and demands of adult consumers, many of whom are current or former smokers. *Id.*,  ¶ 22.

In their role as an alternative to combustible cigarettes, vapor products have been studied extensively, with a general resulting consensus that they pose far lesser risk than combustible cigarettes and hold great potential as a public health harm reduction tool.  *Id.*, ¶¶ 24-26, 28.  As an example, a comprehensive study of all peer-reviewed literature on vapor products that was commissioned by FDA found that: "across a range of studies and outcomes, e-cigarettes pose less risk to an individual than combustible tobacco cigarettes," including conclusive evidence that substituting such products for combustible cigarettes "reduces users' exposure to numerous toxicants and carcinogens" and substantial evidence that switching results in reduced short-term adverse health outcomes in several organ systems.  *Id.*, ¶ 27.  As more current and former

smokers use vapor products instead, combustible cigarette use has dropped from 20.6 percent of the population in 2009, to only 14 percent as of 2017.  *Id.*, ¶ 30.  Also, between June 2018 and June 2019, U.S. cigarette sales volumes fell by more than 10 percent on average.  *Id.*

**II.**    **Unlike Cigarette Manufacturers Whose Products Were  Exempted, Vapor Product Manufacturers are Disadvantaged by the Food, Drug and Cosmetic Act, as amended by the Tobacco Control Act, Which Requires Pre-Market Tobacco Applications for All Vapor Products, Including Those Already on the Market.**

In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act (the "TCA" or the "Act"), Pub. L. No. 111-31, 123 Stat. 1776 (2009) (codified at 21 U.S.C. §§ 387, *et seq.*).  The TCA added a new Chapter IX to the federal Food, Drug and Cosmetic Act ("FDCA") and significantly altered federal regulation of tobacco products by, for the first time, granting FDA the statutory authority to regulate tobacco products and providing for the creation of a new "center" within FDA, the Center for Tobacco Products ("CTP").   The FDCA, as amended by the TCA, defines a "tobacco product" in relevant part as "any product made or derived from tobacco that is intended for human consumption, including any component, part, or accessory of a tobacco product."  21 U.S.C. § 321(rr).

Under Section 901 of the FDCA, the requirements of the TCA originally applied only to cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco (the "Originally Regulated Products").  21 U.S.C. § 387a(b).  The TCA's requirements would only apply to other products meeting the statutory definition of a "tobacco product" if and when the Secretary of Health and Human Services "by regulation deems" such products to be "tobacco products."  *Id.*

On May 10, 2016, FDA finalized its so-called "Deeming Rule"[1] that, for the first time, deemed e-liquids containing, and vapor devices containing or intended to be used with, nicotine

_____

[1] U.S. Food & Drug Admin., *Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control*

5

derived from tobacco plants to be "tobacco products" under the FDCA's definition (the "Newly Deemed Products"). *See* 81 Fed. Reg. 28,974 – 29,106 (May 10, 2016). The Deeming Rule took effect on August 8, 2016. 81 Fed. Reg. at 28,974.

For all new tobacco products that were not on the market as of February 15, 2007, the date of the Act's introduction in Congress, and for grandfathered products that were modified after that date, Section 910 of the FDCA requires obtaining an authorization order from FDA permitting the marketing of such products (referred to as a "marketing authorization order") before such products can be legally sold in the United States. *See* 21 U.S.C. § 387j. The TCA created three pathways to obtaining a marketing authorization order for non-grandfathered tobacco products, but only the PMTA pathway is available to Plaintiffs. VC, ¶¶ 41, 42. Thus, all manufacturers of vapor products must file PMTAs in order to *remain* on the market. *See* Fed. Reg. at 28990-97.

Unlike any vapor products or the other Newly Deemed Products, combustible cigarettes were grandfathered under the TCA and, therefore, are exempted from the onerous PMTA requirement. *Id*., ¶ 39. Indeed, even if changes were made to these "Originally Regulated Products," the Act allowed such new tobacco products to be marketed and sold for years until the FDA got around to reviewing their much less onerous substantial equivalence applications. *See* 21 U.S.C. §§ 387e, 387j; VC, ¶¶ 42-45.

Despite the stated promise of vapor products, the Deeming Rule provided no "grandfathering." Instead, in its preamble published as part of the Deeming Rule, FDA introduced staggered compliance periods for Newly Deemed Products that were on the market

---

*Act; Regulations on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products*, 81 Fed. Reg. 28,973 (May 10, 2016) (codified at 21 C.F.R. § 1143.1) (hereafter, "Deeming Rule").

on the effective date of the Deeming Rule, August 8, 2016.  81 Fed. Reg. at 29,009-29,015. Under this compliance policy, PMTA submissions were required to be filed in 24 months, or by August 8, 2018, and vapor products that were on the market as of August 8, 2016, would not be subject to FDA enforcement action for failure to have filed a PMTA before that date.  81 Fed. Reg. at 28,977-78, 29,011.

### III.   Since the Deeming Rule Took Effect, Vapor Product Companies Have Been Subject To and Have Complied With an Extensive Series of FDA Regulations.

In the three years since the Deeming Rule took effect, all Newly Deemed Products, including vapor products, have been required to comply with a number of regulatory requirements imposed by the TCA and enforced by FDA.  By way of example, immediately upon the August 8, 2016 effective date of the Deeming Rule, vapor product companies became subject to certain record preservation requirements and could no longer market their products with certain advertising and labeling claims—so called "modified risk" claims.  *See* 81 Fed. Reg. at 28,974, 28,976; 21 U.S.C. §§ 387i, 387k.  FDA was also authorized to regulate the methods used in manufacturing and testing vapor products and to mandate new product standards regarding the composition and characteristics of vapor products.  21 U.S.C. §§ 387f(e), 387g.  In 2017, vapor product manufacturers were required to file with FDA copies of "health documents" relating to "health, toxicological, behavioral, or physiologic effects" of their products under 21 U.S.C. § 387d(a)(4).  VC, ¶ 53.

That same year, all U.S. businesses engaged in the manufacture of vapor products were required to register their establishment(s) with FDA and open them to FDA inspection under 21 U.S.C. § 387e(a)(1), (b), (g).  VC, ¶ 54.  To date, approximately 3,686 vapor product manufacturing establishments have been registered.  *Id.*  Each business was also required to identify every one of its vapor products to FDA, including providing copies of product labels and

samples of advertisements.  21 U.S.C. § 387e(i)(1).  As of today, there are more than 3,500,000 vapor products that have been registered with FDA.  VC, ¶ 55.

In 2018, manufacturers and importers of vapor products submitted to FDA all ingredients found in their finished tobacco products as required by 21 U.S.C. § 387d(a)(3).  *Id.*, ¶ 56.  These companies also complied with comprehensive new labeling, packaging and advertising requirements, including the nicotine warning requirement set forth in 21 C.F.R. § 1143.3(a)(1)-(2), which requires prominently placing the following nicotine addiction warning on any vapor products containing e-liquid: **"WARNING: This product contains nicotine.  Nicotine is an addictive chemical."** *Id.*, ¶ 57.

As a result of the implementation of the Deeming Rule, FDA now has robust information regarding the vapor industry and vapor products, including: (i) the identities and locations of vapor product manufacturers; (ii) the products manufactured and sold by those manufacturers; (iii) the ingredients found in those products; and (iv) studies performed by vapor businesses regarding the health effects of those products.

## IV.   FDA Repeatedly Promised Vapor Manufacturers the "Rules of the Road," But Has Failed to Deliver a *Draft* PMTA Rule, Foundational Rules, or Clear Guidance Upon Which Vapor Manufacturers Can Rely for the Mandatory PMTA Process.

Along with its sweeping Deeming Rule, on May 10, 2016, FDA issued a draft industry guidance for ENDS manufacturers titled "Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems, Draft Guidance" ("Draft ENDS PMTA Guidance").[2]  VC, ¶ 60.  However, FDA also repeatedly confirmed that it must take a number of other preliminary regulatory actions to ensure that manufacturers know how to comply with the pre-market filing requirements established by the Act.  *Id.*, ¶ 61.  Specifically, FDA confirmed that further

---

[2]  *See* Draft Guidance, Premarket Tobacco Product Applications for ENDS, 81 Fed. Reg. 2871 (May 10, 2016).

guidance and a formal "foundational rule" would be necessary to provide the "rules of the road" for vapor manufacturers to properly comply with the Act's, the Deeming Rule's, and FDA's PMTA filing requirements.  *Id*., ¶ 61.

In 2016 and 2017, vapor product manufacturers eagerly awaited FDA's action on these items since the PMTA filing deadline was a short time away in August 2018.  *Id*., ¶ 62.  Then, in late July 2017, FDA made a major announcement.  *Id*., ¶ 62.  FDA announced a dramatic change in its regulatory priorities through a new comprehensive plan for the regulation of tobacco and nicotine-containing products that would include reducing the permissible amount of nicotine in combustible cigarettes to minimally addictive or non-addictive levels.  *Id.*  In announcing its new comprehensive plan, FDA emphasized that nicotine is delivered through products that present a continuum of risk and that nicotine is most harmful when delivered through smoke particles in combustible cigarettes—not through aerosol generated by vapor products.  *Id.*

In his July 28, 2017 speech announcing the new comprehensive plan, former FDA Commissioner Scott Gottlieb, M.D., announced that, to make certain FDA was striking an appropriate balance between regulation and encouraging development of innovative tobacco products that may be less dangerous than combustible cigarettes, FDA was providing relief on some deadlines described in the May 2016 Deeming Rule.  *Id.*, ¶ 64.  Then-Commissioner Gottlieb stated: "Our approach to nicotine must be accompanied by a firm foundation of rules and standards for newly-regulated products. To be successful all of these steps must be done in concert and not in isolation."  *Id*., ¶ 65.  Then-Commissioner Gottlieb acknowledged that FDA did not yet have the proper regulations in placed for newly deemed ENDS products when he stated: "One area of emphasis will be to make sure we have the foundational regulatory

architecture to ensure proper oversight of ENDS . . . . Part of this will be developing regulations that we have not yet pursued because the Agency's tobacco program itself is so new." *Id.*

To that end, FDA stated that it planned to issue foundational rules to "make the product review process more efficient, predictable, and transparent for manufacturers, while upholding the agency's public health mission. ***Among other things, the FDA intends to issue regulations outlining what information the agency expects to be included in Premarket Tobacco Applications (PMTAs)***, Modified Risk Tobacco Product (MRTP) applications and reports to demonstrate Substantial Equivalence (SE). The FDA also plans to finalize guidance on how it intends to review PMTAs for ENDS" (emphasis added). *Id.*, ¶ 67.

Following the public announcement of its new comprehensive plan, in August 2017, FDA issued a Guidance for Industry entitled "Extension of Certain Tobacco Product Compliance Deadlines Related to the Final Deeming Rule" (the "August 2017 Guidance").[3]  VC, ¶ 68.  The August 2017 Guidance extended the compliance deadline for manufacturers to submit SE exemption requests and SE reports, as well as PMTAs for vapor products that were on the market as of August 8, 2016.  *Id.*  The new PMTA deadline for such products was now August 8, 2022.  *Id.*  Other than the deadline extension, however, the August 2017 Guidance did not offer any new guidelines or direction on the PMTA application requirements or process.  *Id.* Presumably FDA extended the filing deadline by four years because it was aware that its internal work on crafting the foundational rules, guidance, and product standards would take a significant amount of time, as would manufacturers' compliance with whatever foundational rules and finalized guidance FDA would ultimately publish.  *Id.*, ¶ 69.

---

[3] U.S. Food & Drug Admin., Guidance for Industry, Extension of Certain Tobacco Product Compliance Deadlines Related to the Final Deeming Rule (August 2017).

Over the next two years, through a multitude of periodic public statements, FDA continued to affirm that additional regulation and guidance were necessary for the vapor industry to satisfactorily comply with the filing requirements and submit the information necessary to successfully complete a PMTA. *Id*., ¶¶ 71-75. FDA spoke clearly about the fact that it did not have sufficient regulations in place, that it needed to provide manufacturers with clear rules for PMTA and even testified before Congress that the 2022 deadline was essential so these important foundational rules could be put in place. *Id.* However, despite FDA's repeated statements over the course of almost two years emphasizing the importance of a foundational rule for PMTAs for vapor products and product standards, FDA has failed to make good on its repeated promises. FDA has yet to publish even a *draft* rule on PMTAs for vapor products, much less a final rule, has failed to articulate any product standards, and has failed to propose any good manufacturing practices. VC, ¶ 76.

Instead, FDA shifted its focus almost exclusively to addressing what it called an "epidemic" regarding the illegal use of vapor products by underage teens. *Id*., ¶ 77. On March 21, 2018, FDA published an Advance Notice of Proposed Rulemaking entitled "Regulation of Flavors in Tobacco Products" (the "Flavor ANPRM"). 83 Fed. Reg. 12,294 (Mar. 21, 2018). In July 2018, the VTA and thousands of other stakeholders provided responsive comments. VC, ¶ 77. Since that time, FDA has not responded to the thousands of comments submitted in response to its Flavor ANPRM, nor has FDA published any proposed rule for comment regarding if and how it might regulate flavors in tobacco products, including vapor products. *Id*.

Instead of completing the scientific review of the comments received in response to the Flavor ANPRM, in March 2019, FDA published another draft guidance document entitled "Modifications to Compliance Policy for Certain Deemed Tobacco Products" (the "March 2019

11

Guidance") in which, *inter alia*, FDA announced that it was changing the PMTA deadline for *certain* flavored tobacco products.[4]  In the March 2019 Guidance, FDA stated that it was issuing the March 2019 guidance so that "manufacturers will be *prompted* to move up their filing of premarket submission for certain deemed tobacco products," – the same PMTA applications for which Commissioner Gottlieb testified there were no regulations or rules of the road just a few weeks earlier.  FDA also stated that it would be selectively enforcing a new August 2021 deadline on a "case-by-case" basis against *certain* companies that sold products in *certain* ways never defined in the March 2019 Guidance.  *Id.*, ¶ 79.

The VTA filed comments on the March 2019 Guidance that flagged serious procedural and substantive legal problems.  VC, ¶ 80.  Among other issues, VTA emphasized that the March 2019 Guidance imposing the new August 2021 deadline for "certain" flavored products was not based on FDA's of the science supplied in response to FDA's Flavor ANPRM.  *Id.*  FDA has not responded to the VTA's comments or the thousands of comments it received on the March 2019 Guidance and, to date, has not finalized that guidance.  *Id.*, ¶ 82.

Thus, of the PMTA foundational rules, PMTA guidance, product standards, and good manufacturing practices that FDA has promised over the last two years to help guide vapor manufacturers in their development of PMTAs, FDA has only produced a single "Final" PMTA Guidance document within the last two months (described further below), but has not published the actual PMTA Rule that will provide the basis for companies to spend millions of dollars to comply nor the other foundational rules or other promised documents.  *Id.* ¶ 83.

---

[4] 84 Fed. Reg. 9345, U.S. Food & Drug Admin., Draft Guidance for Industry, Modification to Compliance Policy for Certain Deemed Tobacco Products (March 14, 2019).

**V.     Vapor Stockroom and the VTA's Other Members Justifiably Delayed Working on Their PMTAs in Reliance on FDA's Repeated Promises of Further Clarity Regarding the "Rules of the Road" for PMTAs and FDA's Public Statements and Guidance Stating that Stakeholders Would Have Until August 2022 to File Their PMTAs.**

Relying on FDA's August 2017 Guidance providing that manufacturers would have until August 2022 to submit PMTAs for vapor products that were on the market prior to August 8, 2016, and on FDA's repeated representations between August 2016 and February 2019 that detailed guidance for PMTAs for vapor products *and* foundational rules setting the "rules of the road" for such applications would be forthcoming, many VTA member entities, including Vapor Stockroom and other vapor device and e-liquid manufacturers, waited for the new comprehensive regulatory plan FDA kept promising before spending the millions of dollars required to prepare even a single PMTA.  VC, ¶ 84.

These manufacturers' decision was justified for several reasons.  First, preparing a PMTA is an endeavor that costs millions of dollars and takes years to complete.  (*See* Declaration of Dr. Stacey Benson attached hereto as Exhibit 1, at ¶ 21.)  To be clear, the costs for only harmful and potentially harmful constituent ("HPHC") testing, stability testing, and environmental assessments—which, as discussed below, are only a few of the many tests and studies that FDA requires for a PMTA—for just one unique e-liquid product are over $300,000.  VC, ¶ 85.  For only 10 unique e-liquid products, a company would spend $1,629,470 on just these three components alone.  *Id*.  These actual costs are exponentially greater than the $300,000 to $500,000 total PMTA cost per product that FDA estimated in its 2016 Regulatory Impact Analysis.  *Id*.

13

Second, a PMTA is a highly complex undertaking requiring the coordination of services of multiple outside scientific and laboratories and the development and implementation of a wide variety of research studies. *Id*., ¶ 86.

Third, without the clarity regarding the PMTA filing requirements that FDA has repeatedly promised, FDA has historically rejected 100 percent of PMTAs that vapor product manufacturers have attempted to file due to incompleteness or a lack of necessary information or data. *Id*., ¶ 87. Importantly, in the ten years since the TCA was enacted, FDA has approved PMTAs for only two types of tobacco products, neither of which is a vapor product. *Id*., ¶ 88. One of the approved products relied on over 30 years of epidemiology data—a feat that cannot be replicated for any newly deemed vapor products. The other approved PMTA—submitted by Philip Morris—included about two million pages of submissions, over 35 studies, and required over two years of FDA review. *Id*.

Finally, until the "rules of the road" were finalized, there were no assurances that FDA would not change its recommendations regarding product testing—a concern that later materialized with respect to the onerous Harmful and Potentially Harmful Constituent testing requirements. *Id*., ¶ 89.

## VI.   FDA Only Published its Final ENDS PMTA Guidance on June 11, 2019, and, Therein, Materially Changed its Earlier Recommendations Regarding Critical Harmful and Potentially Harmful Constituent Testing.

After years of delay, on June 11, 2019, FDA finalized its ENDS PMTA Guidance (the "Final ENDS PMTA Guidance"). VC, ¶ 90 and Exhibit 1 thereto. FDA published the Final ENDS PMTA Guidance only one day before proposing to another district court that the PMTA filing deadline be *accelerated* by some 27 months. On that day, FDA spelled out in its Final ENDS PMTA Guidance that, in addition to an extensive review and analysis of the relevant

existing scientific literature, FDA wanted extensive product testing (including aerosol testing), toxicological analysis, stability testing, materials testing, environmental testing, and behavioral testing and analysis.  VC, ¶ 95.  An environmental assessment prepared in accordance with 21 C.F.R. § 25.40 is also required for each PMTA.  *Id.*  Among other things, the Final ENDS PMTA Guidance also seeks "nonclinical in vitro assays that assess . . . toxicities" for comparison to other tobacco products and human clinical studies to study patterns of use (i.e., number of puffs per use, puff duration, puff intensity, frequency of use, and duration of use) and biomarkers of nicotine exposure (i.e., pharamacokinetic studies) and health outcomes such as heart rate, blood pressure, and changes in lung function.  VC, ¶ 96.  Indeed, FDA observes that "[n]onclinical studies alone are generally not sufficient to support a determination that permitting the marketing of a tobacco product would be appropriate for the protection of the public health." *Id.*  As described in further detail below, many facets of FDA's newly revealed testing recommendations cannot be completed in fewer than one to two years, much less ten months.  *Id.*

Importantly, FDA made significant changes from the Draft ENDS PMTA Guidance that had been published over three years earlier in May 2016, including materially changing the list of HPHCs for which FDA recommends vapor products be tested.  *Id.*, ¶ 91.  Of the 29 HPHCs for which FDA recommended extensive testing in the Draft ENDS PMTA Guidance, eight HPHCs were removed from the Final ENDS PMTA Guidance and eleven new HPHCs were added.  *Id.*

Then, to further complicate matters, on August 5, 2019, FDA published a notice in the Federal Register seeking comments on whether, *inter alia*, additional potential constituents never previously identified in either the 2016 Draft ENDS PMTA Guidance or the June 11, 2019 Final

15

ENDS PMTA Guidance—acetic acid and acetoin—should also be included in the list of HPHCs for ENDS products because of their potential adverse respiratory effects.[5]  *Id*., ¶ 93.

Today, after more than 3 years, FDA still hasn't settled on what HPHCs must be tested. Perhaps this is one reason that, with respect to all HPHCs, FDA has never published recommended methodologies for aerosol testing under the "intense" and "non-intense" use conditions, despite recommending such testing in the Final ENDS PMTA Guidance.  VC, ¶ 94.

## VII. FDA Proposed a Twenty-Seven Month Acceleration of the PMTA Filing Deadline to Another District Court and Is Enforcing Same Without Having Given Any Advance Notice or Opportunity for Comment to VTA or Industry Stakeholders.

On March 27, 2018, following FDA's announcement of its new comprehensive plan for the regulation of tobacco and nicotine-containing products, various organizations filed a lawsuit in the United States District Court for the District of Maryland challenging the PMTA deadline extension under the August 2017 Guidance.  VC, ¶ 97.  The case was captioned as *American Academy of Pediatrics v. Food and Drug Administration*, Case No. 8:18-cv-00883-PWG (D. Md.).  *Id*.

On May 15, 2019, the Maryland District Court granted summary judgment for the plaintiffs, holding that FDA had exceeded the scope of its statutory authority and had failed to comply with the Administrative Procedure Act's ("APA") mandatory notice and comment requirements when FDA extended the deadline for receipt of PMTAs for newly deemed products, including vapor products, to August 8, 2022.  *See Am. Acad. of Pediatrics v. FDA*, 379 F. Supp. 3d 461 (D. Md. 2019).  The Maryland District Court's order vacated FDA's August 2017 Guidance and directed further briefing by the parties as to appropriate remedies.  *Id*. at 498.

---

[5] U.S. Food & Drug Admin., Harmful and Potentially Harmful Constituents in Tobacco Products; Established List; Proposed Additions; Request for Comments, 84 Fed. Reg. 38032 – 38035 (Aug. 5, 2019).

16

In directing the parties to file briefs concerning an appropriate remedy, the Maryland District Court noted that "[a]ny Guidance providing for a compliance period will, of course, have to adhere to the notice and comment requirements of the APA."  *Id*.

On May 29, 2019, the plaintiffs in that case filed their remedy brief and requested that the Maryland District Court enjoin FDA to set a deadline of 120 days from the date of the court's order for the filing of PMTAs.  VC, ¶ 100.

Neither Vapor Stockroom nor the VTA was a party to the Maryland District Court litigation.  VC, ¶ 101.  While a limited number of manufacturers and other organizations sought leave to intervene and file briefs on an appropriate remedy after that court's summary judgment decision, on May 31, 2019—well before FDA filed its remedy brief—the Maryland District Court denied their requests on the ground that they had failed to show that the Government could not adequately represent their interests and instead limited them to filing a joint amicus brief of only 15 pages.  *Id*.  The Maryland District Court also held that "until a remedy is proposed and ordered by the Court, [the proposed vapor industry intervenors] cannot show that their rights will be impaired.  ***Indeed, any remedy will involve further action by the FDA, which may well have to comply with the APA notice and comment process.  At such time, [the proposed vapor industry intervenors] would have ample opportunity to be heard regarding the deadlines the FDA proposes to implement*** and the opportunity to protect their interests" (emphasis added).  *Id*.

On June 12, 2019, FDA filed its remedy brief.  VC, ¶ 102.  In its remedy brief, FDA initially argued that the Maryland District Court should remand the matter to FDA so that FDA could follow the proper rulemaking procedures prescribed by the APA to establish a new PMTA deadline for Newly Deemed Products, including vapor products.  *Id*., ¶ 102.  In so doing, FDA contended that "Plaintiffs' proposed timeframe [of four months] could adversely affect the public

health by abruptly clearing the market of e-cigarette products, creating a genuine risk that former smokers addicted to nicotine could migrate back to conventional cigarettes." *Id*. FDA supported its position with a declaration from CTP Director Mitchell Zeller in which he stated that it was the agency's "firm belief" that an accelerated deadline would "create[] a genuine risk of migration from potentially less harmful ENDS products back to combustible tobacco products within the population of addicted adult smokers who have completely switched to ENDS."[6] Zeller Declaration, ¶ 13. Moreover, the Director warned that a four month deadline would prevent most companies from filing PMTA applications such that "it is likely that there would be a mass market exit of ENDS products" that "could adversely affect the public health." *Id*. ¶¶ 15, 22.

Among the concerns FDA cited for opposing the plaintiff's proposed 120-day deadline were that "many ENDS manufacturers will be unlikely to submit quality PMTA applications (e.g., applications that are sufficiently complete and organized to enable CTP to efficiently conduct the required scientific review) for deemed products within a 120-day period" and that "[m]any applicants will be newly regulated entities lacking experience with FDA, and based on our experience to date, the applications are anticipated to be lower in quality and less complete than current-day applications for other FDA regulated products." Zeller Decl., ¶ 18.

However, instead of simply arguing against the plaintiffs' proposed 120-day deadline and for remand to FDA for proper rulemaking consistent with notice and comment requirements under the APA, and despite being under no compulsion to do so, FDA proposed an arbitrary ten-month deadline for PMTA submissions—a fifth, new deadline some 27 months *earlier* than the previously existing deadline. VC, ¶ 105.

---

[6] CTP Director Zeller's Declaration has been filed as Exhibit 2 to the Complaint.

In support of its radically accelerated ten-month PMTA deadline recommendation, FDA stressed that it had published the Final ENDS PMTA Guidance. Zeller Decl., ¶ 5. In reality, the Final ENDS PMTA Guidance was published only *one day* earlier—on June 11, 2019—and, like all of FDA's guidance documents, contains only "nonbinding recommendations." Further, as noted above, FDA substantially changed the list of HPHCs for which extensive methodological development, validation, and aerosol testing is required. FDA also again reiterated that it "intends to issue a proposed rule in the near future to further specify [PMTA] application contents and FDA's review and communication procedures under this pathway." Zeller Decl., ¶ 5. However, as of this filing, even the draft version of this PMTA rule—touted by FDA for years as critical to setting the "rules of the road" for PMTAs for ENDS—has yet to be published. VC, ¶ 107.

Unsurprisingly, the Maryland District Court adopted FDA's ten-month proposal in its July 12, 2019 Order, setting May 11, 2020, as the new deadline for submission of PMTAs. *See Am. Acad. of Pediatrics v. FDA*, 2019 U.S. Dist. LEXIS 116003 (D. Md. July 12, 2019). This date is some twenty-seven (27) months earlier than the previous August 8, 2022 deadline.

**VIII. Vapor Stockroom and the VTA's Other Members Must Now Either Spend Millions of Dollars on PMTAs that They Know Will Be Incomplete by May 11, 2020, or Wait for Additional Regulations from FDA and Face Having to Shut Down Due to FDA Enforcement Action After May 11, 2020.**

Because FDA sought no input from industry prior to offering its superfluous ten-month proposal to the Maryland District Court, FDA was either unaware of or ignored the reality that many manufacturers had yet to start, or had only recently begun, the extensive literature reviews, testing, studies, and analyses required for a PMTA specifically because of FDA's repeated representations that additional clarification on PMTAs would be forthcoming. VC, ¶ 111. FDA

also failed to consider the length of time the FDA-recommended testing and clinical studies will require for an applicant to collect all necessary information for a sufficient PMTA.  *Id.*, ¶ 112.

As explained in detail in the supporting declaration of Dr. Stacey Benson and discussed in the Argument section below, there are multiple technical and capacity-related reasons why vapor product manufacturers simply cannot comply with all of FDA's recommendations for PMTAs set out in its Final ENDS PMTA Guidance on the ten-month timeframe that they currently face.  VC, ¶¶ 112a. – 112.h., 113; Declaration of Dr. Stacey Benson, Exh. 1.

Consistent with FDA's testimony in the Maryland District Court case that four months is insufficient time to avoid the public health crisis that would be caused by the precipitous removal of vapor products from the marketplace for failure to comply with an accelerated PMTA deadline, FDA's arbitrarily selected ten-month deadline is equally insufficient.  VC, ¶ 114. Given the industry's reliance on FDA's repeated promises of rules, regulations, and further clarity regarding PMTA requirements, FDA's complete failure to publish an actual PMTA rule, and the impossibility of completing the myriad test and studies recommended by FDA in only ten months, there is simply no meaningful, rational, or scientifically justified distinction between the four-month deadline against which FDA fought and the ten-month deadline that FDA is now imposing.  Nevertheless, in sharp contrast to FDA's repeated earlier public statements regarding the need for "rules of the road," and, indeed, his own statement only five *days* earlier—on July 10, 2019—that FDA's "policies and procedures [with respect to vapor products] are still evolving," in a statement released on July 15, 2019, in the wake of the Maryland District Court's decision, Acting Commissioner Sharpless claimed that the Maryland District Court "recognized the agency's work to provide . . . clear guidance for companies seeking to market e-cigarette and ENDS products as they prepare their product applications," that "we've outlined our

recommendations for what the FDA expects to be included in e-cigarette premarket applications," and that "[w]e encourage industry to use these resources now as a guide for their submission to the agency."  VC, ¶ 122.

In the face of FDA's inaction on PMTA rules and product and manufacturing standards, its about-face on whether there are sufficient "rules of the road" for PMTA submissions, and the acceleration of the PMTA filing deadline by 27 months and the prospect of FDA enforcement action immediately thereafter, the vapor products industry now faces a life-or-death crossroads. VC, ¶¶  118, 119.  The industry is valued at over $9 billion and directly employs over 87,0000 people whose wages and benefits total more than $7 billion a year.  Declaration of John Dunham, Exhibit 2 hereto, at ¶¶ 5, 8-10.  In size, the vapor industry is  larger than the steel and iron forging industry and comparable to the commercial fishing industry.  *Id.*, ¶ 8.  Another 78,000 people are employed at suppliers of the industry or have jobs that are directly dependent on the vapor industry.  *Id.*  In Kentucky alone, over 2,500 people are directly employed in the vapor products industry.  *Id.*, ¶ 13.  All vapor product manufacturers now face the Hobson's choice of either spending millions of dollars on preparing PMTA submissions for filing by May 11, 2020, that necessarily will be partial and incomplete or waiting for further clarity from FDA and confronting a potential shutdown of their businesses after May 11, 2020 due to FDA enforcement action.  VC, ¶¶ 116, 118.

FDA refers to the threatened industry shutdown as the "mass market exit" of vapor products and has issued a dire warning about how such a mass market exit would reverse the continuing declines in cigarette smoking.  Zeller Decl., ¶¶ 12, 13.  FDA says this adverse public health outcome "should be avoided if at all possible."  *Id.*, ¶ 12.  Fortunately, this Court can do just that by granting the relief requested by Plaintiffs Vapor Technology Association, a national

non-profit industry trade association with more than 800 members dedicated to developing and selling high quality vapor products, VC, ¶ 10, and Vapor Stockroom, a VTA member and Lexington, Kentucky-based manufacturer of nicotine-containing e-liquids, VC, ¶ 13.  For the reasons explained below, the Court should enjoin FDA from taking any enforcement action based on the failure of a vapor product manufacturer to submit a complete PMTA by May 11, 2020, and require FDA to actually complete its PMTA rulemaking process and engage in a proper notice and comment procedure to establish an appropriate deadline for complying with that rule when completed.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 authorizes district courts to grant preliminary injunctive relief.  When considering a motion for a preliminary injunction, a district court must balance four factors:  (1) whether the movant has a strong likelihood of success on the merits; (2) whether, absent the injunction, the movant would suffer irreparable injury; (3) whether the requested injunction would cause substantial harm to others; and (4) whether the public interest would be served by the injunction.  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007).  None of these considerations is a rigid prerequisite.  *Id.*; *see also Suster v. Marshall*, 149 F.3d 523, 528 (6th Cir. 1998) (quoting *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992)).  Rather, they are interconnected factors that the Court must balance to determine if a preliminary injunction should be granted.  *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003).  Put another way, these factors need not be given equal weight, but are simply intended to "guide the discretion of the court."  *Suster*, 149 F.3d at 528 (quoting *In re Eagle-Picher*, 963 F.2d at 859).

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The plaintiff bears the initial burden of proving that a preliminary injunction is warranted. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "A preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Certified Restoration*, 511 F.3d at 542 (internal quotation marks omitted). Thus, "a party 'is not required to prove his case in full at a preliminary injunction hearing and the findings of fact and conclusions of law made by a court granting the preliminary injunction are not binding at trial on the merits.'" *Id.* (quoting *Camenisch*, 451 U.S. at 395).

## ARGUMENT

The current dispute arises from (a) Defendants' failure or refusal to provide the actual rule and the definitive guidance and requirements on what vapor product manufacturers must provide in their PMTAs to ensure that their products can legally remain on the U.S. market, (b) Defendants' repeatedly shifting PMTA deadlines—most recently arbitrarily accelerated by some twenty-seven (27) months to May 11, 2020, in which to prepare and file such applications, and (c) Defendants' refusal to acknowledge or consider the practical impossibility of manufacturers submitting a complete application within their newly established deadline. For the reasons set forth below, each of the four preliminary injunction factors weighs strongly in favor of Plaintiffs' requested relief.

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR ADMINISTRATIVE PROCEDURE ACT AND DUE PROCESS CLAIMS.

The VTA and Vapor Stockroom are likely to succeed on the merits of their claims. As explained below, by superfluously proposing an abbreviated ten-month deadline for the filing of

PMTAs when it had previously established a deadline some 27 months longer upon which vapor product manufacturers had reasonably relied while also failing to publish long-promised foundational rules setting forth the requirements for PMTAs, FDA acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2)(A).  Moreover, FDA also violated the APA's procedural requirements by doing so without notice or any opportunity for comment in violation of 5 U.S.C. § 553.  Further, FDA's actions also violated Plaintiffs' Fifth Amendment due process rights.

> **A.**   **FDA Violated the Administrative Procedure Act By Superfluously Suggesting and Imposing a Grossly Accelerated PMTA Compliance Deadline Without Any Foundational Rules in Place Regarding the Submissions' Required Contents or Any Associated Notice and Comment Procedure.**

The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D); *Hassan v. Gonzales*, 403 F.3d 429 (6th Cir. 2005).  FDA's superfluous proposal and current imposition of an abbreviated ten-month deadline to submit PMTAs in the context of litigation while failing to publish even a draft foundational rule regarding their required contents violated both requirements of the APA.

> **1.**   **FDA's actions were arbitrary and capricious because they failed to take into account for at least three important "aspects of the problem": (i) vapor product manufacturers' significant reliance interests in FDA's earlier statements regarding the PMTA deadline; (ii) the impossibility of completing any, much less "high quality," PMTAs within a ten-month time frame; and (iii) the lack of long-promised "foundational rules" regarding the PMTA's required contents.**

Under the APA's "arbitrary and capricious" standard, a reviewing court "'must consider whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"  *Ky. Waterways Alliance v. Johnson*, 540 F.3d 466,

473 (6th Cir. 2008) (quoting *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989)).  An

agency decision is arbitrary and capricious where, *inter alia*, the agency has "entirely failed to

consider an important aspect of the problem."  *Id.* (quoting *Nat'l Ass'n of Home Builders v.

Defenders of Wildlife*, 551 U.S. 644, 658 (2007)).   While review under the arbitrary and

capricious standard is deferential, such "'does not mean that [it] must also be inconsequential.'"

*Id.* at 474 (quoting *Moon v. Unum Provident Corp*., 405 F.3d 373, 379 (6th Cir. 2005)). "'The

arbitrary-and-capricious standard . . . does not require us merely to rubber stamp the [agency's]

decision.'"  *Id.* (quoting *Jones v. Metropolitan Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004)).

"Indeed, '[d]eferential review is not no review, and deference need not be abject.'"  *Id.* (quoting

*McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)).  Here, there are

at least three "important aspect[s] of the problem" that FDA failed to consider and which provide

independent bases for finding that FDA acted arbitrarily and capriciously in proposing a ten-

month deadline for the submission of PMTAs to the Maryland District Court and then imposing

that deadline when the Court agreed.

> **a.**    **FDA failed to consider vapor product manufacturers'
> significant reliance interests after repeatedly making
> affirmative declarations that new regulations and rules were
> coming.**

First, FDA failed to take into account vapor product manufacturers' significant reliance

interests in FDA's earlier statements regarding the PMTA deadline.  The Supreme Court has

long recognized that agency actions that fail to account for industry stakeholders' legitimate

reliance on prior contradictory or inconsistent agency pronouncements are arbitrary, capricious,

or an abuse of discretion.  *See*, *e.g.*, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126-

27 (2016) (holding Department of Labor rule construing exemption from FLSA overtime

provisions not entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense*

*Council, Inc.*, 467 U.S. 837 (1984), because agency's summary explanation for re-interpretation was insufficient given decades of industry reliance on agency's prior contradictory interpretation in enforcement policy); *Fox Television Stations v. FCC*, 556 U.S. 502, 515-16 (2009) (observing that it is "arbitrary and capricious" for federal agencies to ignore "serious reliance interests" engendered by a prior policy without a reasoned explanation addressing the relevant facts and circumstances created by such reliance); *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) ("Sudden and unexplained change . . . , or change that does not take account of legitimate reliance on prior interpretation . . . may be 'arbitrary, capricious [or] an abuse of discretion'" (internal citations omitted).)  Very recently, the Supreme Court warned that agency positions that are '"merely convenient litigating position[s]" or "post hoc rationalizatio[n] advanced" to "defend past agency action against attack" are not entitled to deference.  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 (2019) (internal quotations omitted).  New agency interpretations that create "unfair surprise" to regulated parties and disrupt expectations are disfavored.  *Id*. at 2417-18.

At the time FDA announced its new comprehensive plan for the regulation of tobacco and nicotine-containing products in late July 2017 and thereafter, it publicly and repeatedly promised to establish foundational rules setting out the requirements for PMTA submission.  In its various follow-up statements through the remainder of 2017 and 2018, FDA made clear that it did not have the requisite rules and regulations in place for the PMTA process:

- On November 3, 2017, then-Commissioner Gottlieb stated that "[t]he foundational regulations for the tobacco program were never put in place and so we're going to take the time to put those in place so we have a firm foundation from which to regulate."  VC, ¶ 71.

- In a March 15, 2018, press release, then-Commissioner Gottlieb reiterated that FDA was planning to take steps to ensure that its "policies and processes for the regulation of tobacco products are efficient and predictable," and that, to that end, "we plan to issue a series of foundational rules and guidance documents that will delineate key requirements of the regulatory process, such as the demonstration of

26

substantial equivalence and the submission of applications for new tobacco products." *Id.*, ¶ 73.

- On August 2, 2018, FDA released a statement entitled "Advancing Tobacco Regulation to Protect Children and Families," which stated that "foundational proposed rules" are needed "regarding the basic rules of the road, especially when it comes to what's expected in premarket applications." *Id.*, ¶ 74.

FDA also explicitly tied the establishment of foundational rules to the extension of the PMTA filing deadline to August 2022. Former Commissioner Gottlieb reiterated these points as recently as February 27, 2019. Testifying before Congress under oath, when pressed about concerns that the very high costs associated with a PMTA would financially "devastate the smaller companies in this industry" and lead to a "smaller market controlled by big companies with fewer choices for adult smokers, higher prices, and probably less innovation" and the concern that "[i]f adult smokers who wish to use e-cigarettes to reduce or end their use of combustibles cannot find the products that they like, they may not change, and the public health will suffer," then-Commissioner Gottlieb testified:

> Well, we are cognizant of this concern, Mr. Chairman, and in part, you know ***our desire to extend the application deadlines on these products and give them until 2022 is to give us the . . . time to put in place the implementing regulations and guidance that would not only provide the rules of the road for how to effectively traverse the PMTA process***, but also take into consideration the kinds of challenges that you bring up about how we can build into our regulation and guidance accommodations for small manufacturers.[7]

VC, ¶75 (emphasis added). Thus, as recently as February 2019, FDA assured Congress that it needed substantial time to complete the guidance and foundational rules and to work into its new regulatory structure provisions that will ensure that FDA's actions do not drive small businesses out of the marketplace entirely. Importantly, FDA can point to no action taken since that time

---

[7] *Id.* at 35 (statements of Chairman Sanford D. Bishop, Jr., Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies, and Dr. Scott Gottlieb, FDA Commissioner).

*where it has built into the PMTA "regulations and guidance" any "accommodations for small manufacturers" and still has not published any foundational rule governing PMTAs itself.*

Vapor product manufacturers, including Vapor Stockroom and the VTA's other members, reasonably relied on FDA's promises of foundational rules and finalized guidance setting forth the "rules of the road," or the content requirements for PMTAs, by holding off on preparing PMTAs until such foundational rules were published and finalized. As illustrated by former Commissioner Gottlieb's quote, small manufacturers such as Vapor Stockroom and other VTA members were advised that FDA was working on "accommodations for small manufacturers," and thus acted reasonably in waiting in reliance on FDA's promises of foundational rules.

Indeed, given the costs associated with PMTAs, small manufacturers would have acted irrationally to forge ahead given the then-Commissioner's oft-repeated statements. Based on the non-binding "recommendations" set forth in FDA's Final ENDS PMTA Guidance, PMTAs are highly complex undertakings requiring the coordination of multiple outside scientific advisors and laboratories and the development and implementation of a wide variety of research studies. The costs of harmful and potentially harmful constituent testing, stability testing, and environmental assessments alone—which constitute only a fraction of the multitude of tests and studies that FDA recommends for a single PMTA—for 50 unique e-liquid products are **more than $7 million**. VC. ¶ 85.

Businesses were also reasonably relying on FDA's promises since, to date, one hundred percent of PMTAs submitted for vapor products have been rejected by FDA due to incompleteness or a lack of necessary information or data. With this history, it would have been a fool's errand for manufacturers to press ahead down an undefined pathway.

Moreover, until final foundational rules setting forth the "rules of the road" are published, manufacturers will have no assurances that FDA would not further change the "recommendations" set forth in its non-binding ENDS PMTA Guidance.  To be sure, such is precisely what occurred when FDA substantially revised the list of HPHCs for which it recommended testing between its Draft ENDS PMTA Guidance from 2016 and its Final ENDS PMTA Guidance.  Indeed, it is not even clear that the Final ENDS PMTA Guidance is truly "final."  FDA again surprised stakeholders just weeks ago when it proposed adding more HPHCs to the list for vapor products in an August 5, 2019 notice in the Federal Register.

Similarly, until FDA publishes an actual PMTA rule, vapor product manufacturers will have no guidance on basic testing questions, such as FDA's preferred methodology for conducting aerosol testing under the "intense" and "non-intense" use conditions recommended in the Final ENDS PMTA Guidance.  VC, ¶ 94; Benson Decl., Exh. 1, ¶ 14.

In justifying its superfluous proposal of a new PMTA deadline as short as ten months away to the Maryland District Court, FDA failed to acknowledge the serious reliance interests engendered by FDA's repeated promises of foundational rules and finalized guidance documents setting forth the "rules of the road" for PMTAs for vapor products.  FDA recognized that a four-month deadline would likely lead to a "mass market exit of ENDS products," and claimed that a ten-month deadline "would at least reduce the potential for . . . the risk of a mass market exit."  FDA also again promised that it intended to issue a *proposed* rule "to further specify [PMTA] application contents."  Zeller Decl., ¶ 5.  However, FDA completely failed to acknowledge or address industry's reliance on such promises made by FDA over the prior two years.  Instead, in

4852-5920-7587.1

its brief to the Maryland District Court, FDA flippantly contended that "manufacturers were not precluded from submitting applications earlier."[8]

By failing to account for vapor manufacturers' reasonable reliance on FDA's repeated promises of regulations and finalized guidance setting forth the "rules of the road" and requirements for PMTAs over the course of two years while proposing a dramatically shortened PMTA filing deadline, FDA "entirely failed to consider an important aspect of the problem" and thus engaged in agency action that was arbitrary and capricious. *See Nat'l Lifeline Ass'n v. FCC*, 915 F.3d 19, 22, 31 (D.C. Cir. 2019) (holding that, because FCC failed to consider key aspects of a prior forbearance policy, including the reliance interests of affected carriers and their Tribal consumers and the likely "exodus of facilities-based providers from the Tribal Lifeline program," FCC's "adoption of the Tribal Facilities requirement was arbitrary and capricious"). The fact that FDA took the position that it did in the context of litigation, rather than a guidance document or Federal Register notice, is of no moment; FDA's position was a "convenient litigating position" that created "unfair surprise" to vapor manufacturers and so was arbitrary and capricious. *Kisor*, 139 S. Ct. at 2417-18.

> **b.  FDA failed or simply refused to consider at least ten reasons why vapor manufacturers cannot complete PMTAs within a ten-month time frame.**

FDA also arbitrarily and capriciously failed to consider the impossibility of completing any, much less "high quality," PMTAs within a ten-month time frame. FDA fully appreciated the significance, complexity and onerousness of the PMTA process that it was considering. However, after repeatedly telling manufacturers that its rules, regulations and guidance were not ready to be relied upon, FDA published its Final ENDS PMTA Guidance on June 11, 2019—

---

[8] Remedy Brief for Defendants FDA, et al., *Am. Academy of Pediatrics, et al., v. FDA*, No. 8:18-cv-883 (D. Md. June 12, 2019), at *9, at  ECF No. 120.

only one day before FDA made its ten-month proposal to the Maryland District Court.  It is undeniable that, on its face, the Final ENDS PMTA Guidance is "non-binding" and contains only "recommendations" regarding the contents of a PMTA.  *See* 2019 Final ENDS PMTA Guidance, Exhibit 1 to Verified Complaint; *see also* Benson Declaration, Exh. 1, at ¶ 8.

The Final ENDS PMTA Guidance leaves unanswered far too many significant questions that are fundamental, if not essential, to the preparation of a PMTA including: (i) the applicable good manufacturing standards for product quality, supply chain assessment, and product testing;[9] (ii) the methods or assumptions that should be incorporated into the environmental assessment required by 21 C.F.R. § 25.15; (iii) when it may be appropriate to conduct a bridging study to bridge data from a study of one vapor product to another; and (iv) acceptable methodologies and protocols to conduct aerosol testing on devices and e-liquids, including standard device or device settings for testing of e-liquids and standard e-liquids for testing of "open-system" devices.  *See* Benson Decl., Exh. 1, at ¶¶ 11-14.  As explained in Dr. Stacey Benson's declaration, resolution of these questions can have dramatic consequences as regards the costs and time required to design and execute studies.  *Id.*, ¶¶ 15-16.  By way of example, one possible interpretation of the Final ENDS PMTA Guidance could lead to six potential use scenarios for a clinical study design that would likely take 12 to 18 months to complete, while another could result in 108 possible use scenarios that would take several years to complete and, by implication, be significantly more costly to perform.  *Id.*, ¶ 15.

Most importantly, however, FDA simply ignored the fact that, even assuming an applicant's financial wherewithal, a ten-month time frame is simply impossible and inadequate

---

[9] On page 11 of its Final ENDS PMTA Guidance, FDA continues to promise that tobacco product manufacturing practices "will be set forth in a future rulemaking" but provides no target date for even a proposed rule to be published.

for the submission of a PMTA that complies with the recommendations set forth in the Final ENDS PMTA Guidance for at least ten reasons.  Benson Decl., Exh. 1, at ¶ 19.

*First*, there are simply not enough labs or lab space to conduct and complete the volume of aerosol HPHC testing required in ten months.   There are only five or six laboratories with both meaningful vapor product aerosol testing experience and which are compliant with FDA's good laboratory practices regulations that exist in the United States, Canada, and the United Kingdom. Benson Decl., Exh. 1, at ¶ 20.c.  And, one of these laboratories does not have the capability of generating its own aerosol in-house.  *Id.*

*Second*, none of the aerosol testing laboratories currently have independently validated testing methodologies or assays detecting and quantifying all of the HPHCs that FDA just added to their list of recommended testing in the Final ENDS PMTA Guidance published on June 11, 2019.   Benson Decl., Exh. 1, at ¶ 20.d. The process for obtaining approval for such methodologies from accrediting laboratory organizations such as the American Association for Laboratory Accreditation may take weeks or even months.  *Id*.

*Third,* there are not enough qualified labs to conduct and complete complex human clinical studies in only 10 months.  There are six or fewer clinical laboratories in the United States with the expertise and experience to execute the type of clinical studies recommended by FDA.  *Id.*, ¶ 20.h.  The earliest any of these laboratories is even available to *begin* such a study is not until the end of October 2019.  *Id.*   Thus, there is thus no possibility of completing the studies, writing up the results, and incorporating them into a complete PMTA package by May 11, 2020.  *Id*., ¶ 20.g.  The capacity of these laboratories will thus fall far short of that required by the industry to meet the ten-month filing deadline suggested by FDA for over three million vapor products.  *Id*.

*Fourth*, as regards HPHC testing, the currently available laboratory equipment is not sophisticated enough to determine whether, for particular constituents, the amounts detected in aerosol exceed the threshold levels of toxicological concern specified as the reference point by FDA. FDA has said that the exposure levels should be compared against threshold levels of concern for the general population. Benson Decl., Exh. 1, at ¶ 20.e. However, the limits of detection with currently available laboratory equipment are substantially greater than the general population-level threshold levels of concern for a number of the HPHCs, meaning that laboratories cannot meaningfully determine whether HPHCs emitted in the aerosol from such products exceed the threshold levels of concern without performing thousands of puffs on a single device, which is neither realistic nor feasible. *Id.*

*Fifth*, FDA has still not published a long-promised guidance document on an approved methodology for the testing of vapor device aerosol for HPHCs, leaving both e-liquid and vapor device manufacturers to only guess as to what testing methodologies might be appropriate and then spend hundreds of thousands, if not millions, of dollars on executing on an approach that may or may not be accepted by FDA. Benson Decl., Exh. 1, at ¶ 14; *see also* Declaration of Anthony Abboud, Exhibit 3 hereto, at ¶¶ 15-18.

*Sixth*, product stability and shelf life testing requires more than a year. Absent clarification from FDA as to the minimum acceptable duration for product stability and shelf life testing (which FDA recommends in its Final ENDS PMTA Guidance), applicants must look to industry guidance for stability testing of new drug substances and products, which is at least twelve (12) months. Benson Decl., Exh. 1, at ¶ 20.f. Thereafter, the testing data needs to compiled, analyzed, reviewed for conclusions, and written up.

*Seventh*, scientifically proper human clinical studies cannot be completed in 10 months. Even assuming lab availability, applicants will need at least 12 months, and more likely 24 months, to complete clinical studies. FDA recommends studies on vaping topography (i.e., patterns of product use) and pharmacokinetics (or nicotine uptake), such studies must be performed clinically, and the shortest time frame in which such a study can be completed is 12 months. Benson Decl., Exh. 1, at ¶ 20.g. This is because even a small clinical study requires: (i) development of a study protocol, review and approval by an institutional review board, or IRB; (ii) execution of the study (which will often require subjects to stay overnight at the clinical laboratory facility for a period of approximately a week); (iii) capture and presentation of the resulting data in a format appropriate for FDA review, and (iv) analysis, interpretation, and explanation of the data in a detailed written report. *Id*. Indeed, 24 months a more appropriate estimate for the time needed to complete such as study. *Id*. Again, there are only a handful of clinical labs with the relevant experience and credentials to execute these studies, and their availability is highly restricted. *Id*.

*Eighth*, the nationally representative behavioral studies required by FDA cannot be completed in less than ten months. Benson Decl., Exh. 1, at ¶ 20.i. Such is the case because, to be truly nationally representative, such a survey requires a sampling plan and thousands of participants. *Id*. The planning and execution of such behavioral studies simply cannot be properly executed in less than 10 months.

*Ninth*, there are a significant number of open technical questions related to the preparation of a PMTA, including as regards good manufacturing practices, environmental assessments, bridging studies, and aerosol testing methodologies—including device settings for e-liquids, e-liquids for open system devices, and "heavy" and "light" use patterns for harmful

34

and potentially harmful constituent testing.  Benson Decl., Exh. 1, ¶ 20.a.  Until further clarity is provided through a final foundational rule on PMTAs, resolution of each of these questions requires pre-submission meetings and extensive communication that can last months between the applicant and the Office of Science within FDA's Center for Tobacco Products.  *Id*.  Such meetings and communications are critical to determining appropriate methodologies and parameters before the recommended testing and studies can even be initiated, as there is no sense in an applicant starting product testing and studies before it receives particularized guidance from FDA with respect to its planned approach in these areas.  *Id*.

The *tenth* and final reason that the FDA failed to consider the impossibility of a ten-month deadline is the fact that a ten-month deadline is, in reality, only a seven-month deadline.  This is the case because a PMTA submission that includes everything FDA recommends in its Final ENDS PMTA Guidance is likely to be *at least* 50,000 pages in length and the consulting firms that specialize in compiling and organizing such submissions for FDA's review require that all relevant documents be provided to them at least three (3) months prior to the deadline for filing so that they have sufficient time to organize, collate, and create internal cross-references and links in the final submission package.  Benson Decl., Exh. 1, at ¶ 20.j.   Given FDA's recognition that this will be the first time that most of the applicants have ever filed a PMTA, and given the fact that most are smaller companies without enormous internal compliance departments and thousands of staff, Vapor Stockroom and the VTA's other members will necessarily have to rely on these third-party consultants.  Thus, an applicant would have to have all of its studies and testing completed and write-ups prepared and transmitted to such a consulting firm by February 11, 2020, in order for the submission to be sent to FDA by May 11, 2020.

In FDA's submissions to the Maryland District Court, including Director Zeller's declaration, FDA entirely failed to address the lab capacity issues and other above-referenced factors that make it impossible for an applicant that reasonably relied on FDA's promises of further clarification by way of foundational rules for PMTAs to complete and submit a PMTA on a ten-month timeframe. By failing to consider the impact of these practical considerations on the feasibility of a ten-month timeframe, FDA "failed to consider an important aspect of the problem," and acted arbitrarily and capriciously in proposing a ten-month deadline to the Maryland District Court.

> **c.** **FDA acted capriciously through its failure to consider the lack of long-promised "foundational rules" regarding the PMTA's required contents and its willingness to impose a grossly accelerated deadline knowing that its actual rule will not be complete.**

Finally, in proposing a ten-month PMTA deadline, FDA also failed to consider the lack of long-promised "foundational rules" regarding the PMTA's required contents. Indeed, it is axiomatic that manufacturers must know what is the rule with which they must comply *before* they can be expected to comply and they must know what is required of them before they are subject to enforcement action for noncompliance. As noted above, PMTAs are highly complex undertakings with costs well into the millions of dollars, yet the only guidance provided to date is "non-binding" and contains only "recommendations." Through its multiple public statements dating back to July 2017, FDA itself recognized that vapor manufacturers required "regulations outlining what information the agency expects to be included in [PMTAs]" in order to "make the product review process more efficient, predictable, and transparent for manufacturers." VC, ¶ 67.

What is most capricious, perhaps, is the fact that FDA actually intends to force compliance with the PMTA submissions *before* an actual PMTA rule even exists. This fact was

made clear in FDA's declaration filed with the Maryland District Court, in which FDA confirmed that a ten-month deadline would *not* allow sufficient time for such a rule to even be finalized:

> If the Court nevertheless finds it necessary to enter an injunction requiring the submission of premarket applications by a date certain, it should not set a deadline sooner than 10 months from now—a date that I believe would at least make it *feasible* for more manufacturers to develop and submit complete and high quality applications, and for FDA to publish a proposed PMTA rule *and be close to finalizing* the SE and PMTA rules."

Zeller Decl., ¶ 13 (emphasis added).  More than two months have passed since the filing of that declaration and still a *draft* rule has not been published.  This virtually guarantees what FDA predicted: companies will be forced to comply with a rule in May 2020 in the absence of the actual rule.

Forcing vapor product manufacturers to engage in "non-binding" costly experimentation, research, and studies in such circumstances smacks of arbitrariness and capriciousness.  This is especially true because the requirements keep shifting and FDA still does not know what it will ultimately require.  Most importantly, vapor manufacturers will not know what is required of them.  Absent a final rule setting forth the required contents of a PMTA for vapor products, and as illustrated by the situation regarding recommending testing for HPHCs in the Draft and Final ENDS PMTA Guidance, manufacturers run the risk of being forced to speculatively spend millions of dollars on testing and studies that may or may not be required for a PMTA to prove that a marketing authorization order is "appropriate for the protection of the public health."  21 U.S.C. § 387j(c)(2)(A).[10]   Further, because of the now-curtailed compliance period, even if

---

[10] Indeed, in a declaration filed with the Maryland District Court, a representative of Juul Labs, Inc. ("JLI")—which is not a VTA member—testified that, working off of the 2016 ENDS PMTA Guidance published in 2016, JLI has 87 dedicated full-time employees working on its PMTAs and has already dedicated more than $50 million to preparing the applications, with plans to

manufacturers had budgeted to complete their filing by 2022, that does not mean that all of the necessary funds are immediately available now.

By failing to consider the impact of the lack of foundational rules setting forth the required contents of a PMTA, FDA "failed to consider an important aspect of the problem," and acted arbitrarily and capriciously in proposing a ten-month deadline to the Maryland District Court and now imposing enforcement of that deadline.

> ### 2.   FDA's violated that APA's procedural requirements by proposing a ten-month timeframe without notice to Plaintiffs or any opportunity for public comment.

In addition to being arbitrary and capricious, FDA's proposal of a ten-month PMTA submission deadline violated the APA's procedural notice-and-comment requirements.  Section 2 of the APA defines a "rule" as including "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."  5 U.S.C. § 551(4).  A "rule making," in turn, includes not only the initial issuance of new rules, but also the repeal or amendment of existing rules.  5 U.S.C. § 551(5).  Under Section 4 of the APA, all agency rules must go through a mandatory notice and comment period process to be valid.  5 U.S.C. § 553(b), (c); *accord Tennessee Hosp. Ass'n v. Azar*, 908 F.2d 1029, 1042 (6th Cir. 2018) ("If an agency attempts to issue a legislative rule without abiding by the APA's procedural

---

spend a total or more than $125 million by the end of 2019.  However, "[t]he absence of sufficient information from FDA on what specifically those applications must include has caused JLI to be conservative in its preparations in order to guard against FDA penalizing it for a lack of thoroughness."  Declaration of Joanna Engelke, Juul Labs, Inc. Chief Quality and Regulatory Officer, Doc. No. 113-4 in Case No. 8:18-cv-883-PWG (D. Md. June 12, 2019).  Needless to say, JLI's financial wherewithal is highly unique and not at all comparable to the significantly more limited financial resources of Vapor Stockroom and the VTA's other manufacturer members.

4852-5920-7587.1

requirements, the rule is invalid.").  Exceptions to the notice and comment requirement exist, however, for "interpretative rules" and "general statements of policy."  5 U.S.C. § 553(b).

While the distinction between a legislative rule and an interpretive rule or general statement of policy can be "difficult to discern," *Tennessee Hosp. Ass'n*, 908 F.2d at 1042, rules that "'intend[] to create new law, rights or duties'" are legislative, while those that "'simply state[] what the administrative agency thinks the statute means, and only remind[] affected parties of existing duties'" are interpretive.  *Id*. (internal citations omitted).  Significantly, because interpretive rules cannot effect a substantive change in regulations, a rule that adopts a new position inconsistent with any existing regulation is necessarily legislative in nature.  *Id*. (citing *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995)).

Here, to the extent that, as the Maryland District Court found, *Am. Academy of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 494-98 (D. Md. 2019), FDA's 2017 Guidance setting an August 8, 2022 deadline for the filing of PMTAs constituted a legislative rule that was subject to the APA's notice and comment requirements, then it necessarily follows that FDA's superfluous proposal of an abbreviated ten-month deadline also constitutes a legislative rule.[11]

---

[11]  The conclusion that FDA's 2017 Guidance was a legislative rule does not require the conclusion (reached by the Maryland District Court, 379 F. Supp. 3d at 491-94) that FDA acted in an *ultra vires* fashion in extending the compliance period for filing PMTAs for vapor products already on the market when the Deeming Rule took effect.  In the Deeming Rule itself, FDA set forth a compliance policy that was modified by the August 2017 Guidance.  81 Fed. Reg. 29,010 – 29,015.  This compliance policy was a legislative rule because it purported to impose legally binding obligations on regulated parties that could serve as the basis for an enforcement action for its violation.  *Sec. Indus. & Fin. Mkts. Ass'n v. United States CFTC*, 67 F. Supp. 3d 373, 416 (D.C. 2014).  Because both the original compliance policy announced with the Deeming Rule and the August 2017 Guidance amending that original compliance policy effected a "substantive change to the . . . regulatory regime," and without them there would not have been "an adequate legislative basis for an enforcement action," *id*. at 416, both were legislative rules.  Put another way, each iteration of the compliance policy was a binding legislative rule because "it commands, it requires, it orders, it dictates," and FDA based its enforcement actions on the compliance policy.  *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000).

In the face of the Maryland plaintiffs' challenge to FDA's action, FDA's remedy was to seek remand in order to engage in the notice and comment period that the Maryland District Court found was lacking.  FDA's request for remand as the remedy was well established in the law.  *See California Communities Against Toxics v. United States EPA*, 688 F.3d 989, 992 (9th Cir. 2012) ("Generally, courts only refuse voluntarily requested remand when the agency's request is frivolous or made in bad faith."); *Hill Dermaceuticals v. FDA*, 709 F.3d 44, 46 n.1 (D.C. Cir. 2013) (holding that, even where a preliminary injunction is appropriate, such relief "would need to be limited only to vacating the unlawful action, not precluding future agency decisionmaking"); *Bennett v. Donovan*, 703 F.3d 582, 589 (D.C. Cir. 2013) (declining to require specific action by the agency in question, noting that "it is the prerogative of the agency to decide in the first instance how best to provide relief"); *Palisades Gen'l Hosp. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (holding that district court had no jurisdiction to order specific relief after finding that agency action was arbitrary, capricious, or otherwise not in accordance with the law, and should have only vacated the secretary's decision and remanded for further action consistent with its opinion).[12]

---

Although it may well have been the case that FDA violated the requirement under 5 U.S.C. § 553 to provide notice and the opportunity for public comment when it published the August 2017 Guidance, the remedy for this failure was not the imposition of a new legislative rule without notice and comment by suggestion for inclusion in a court order.  Rather, it was to remand the decision to FDA.  Put otherwise, two wrongs do not make a right.

[12] *See also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004) (holding that the principal purpose of APA limitations is to protect agencies from undue judicial interference because "pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA"); *City of New York v. DOD*, 913 F.3d 423, 429–31 (4th Cir. 2019) (noting that courts are "woefully ill-suited" to adjudicate general grievances by entering "obey the law" injunctions against agencies and prohibited from engaging in "day-to-day oversight of the executive's administrative practices" by the APA); *N. Carolina v. EPA*, 550 F.3d 1176, 1177–78 (D.C. Cir. 2008) (remanding for EPA to conduct further proceedings consistent with the court's opinion, and specifically declining to impose a definitive deadline by which the EPA must correct the challenged flaws).

Indeed, prior to FDA's submission of its remedy brief, the Maryland District Court held that FDA could not adopt guidance setting a new compliance deadline without going through the APA's notice and comment period. *Am. Academy of Pediatrics*, 379 F. Supp. 3d at 498 ("Any Guidance providing for a compliance period will, of course, have to adhere to the notice and comment requirements of the APA."). Yet, instead of insisting that such procedures be followed, and contrary to FDA's many public representations to Plaintiffs and other industry stakeholders, FDA superfluously suggested that the Maryland District Court could engage in exactly the type of arbitrary rule-making that FDA could not and set a new 10-month compliance deadline without providing any of the interested and affected parties who would have to comply with the new rule notice or an opportunity to be heard. Such "regulation by litigation" violates the APA because FDA failed to provide any notice or opportunity for Plaintiffs to comment on the superfluous ten-month proposal. The Court must enjoin enforcement action by FDA based on the deadline because it was established without observance of procedure required by law. 5 U.S.C. § 706(2)(D).

> **B.** **FDA Violated Plaintiffs' Fifth Amendment Due Process Rights by (i) Superfluously Suggesting the Abbreviated Ten-Month Deadline for PMTA Submissions and (ii) Failing to Give Fair Notice of What is Required to File a "High Quality" PMTA for a Vapor Product.**

FDA has also violated Plaintiffs' Fifth Amendment due process rights in two distinct ways: (1) by superfluously suggesting the abbreviated ten-month PMTA deadline; and (2) by failing to give vapor product manufacturers fair notice of what is required to file a "high quality" PMTA.

4852-5920-7587.1

1.   **FDA's superfluous suggestion of a ten-month deadline violated Plaintiffs' Fifth Amendment due process rights.**

FDA's superfluous proposal of a ten-month PMTA filing deadline violated not only FDA's statutory obligations under the APA, but also the Fifth Amendment due process rights of Vapor Stockroom and other VTA members. The Fifth Amendment provides, in relevant part, that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const., amend. V. To establish a procedural due process claim, a plaintiff must establish three elements: (1) that it has a protected liberty or property interest; (2) that it was deprived of this property interest; and (3) that the government did not afford the plaintiff adequate pre-deprivation procedural rights. *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 900 (6th Cir. 2019); *Chandler v. Vill. Of Chagrin Falls*, 296 Fed. Appx. 463, 468-469 (6th Cir. 2008); *Mertik v. Blalock*, 983 F.2d 1353, 1366 (6th Cir. 1993). Here, as explained below, FDA's enforcement of a ten-month deadline deprives Plaintiffs of their due process rights because it deprives them of their right to engage in a lawful business without notice or an opportunity to be heard.

a.   **Vapor Stockroom and the VTA's other members have a protected interest in participating lawfully in interstate commerce.**

To have an interest protected by due process, a party must have more than an abstract need or desire—the party must have "a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Such interests are not created by the Constitution, but are defined by existing "rules or understandings that secure certain benefits and that support claims of entitlement to these benefits." *Id.*

Stigma generated by an agency that has resulted in lost business relationships and that may preclude a plaintiff from pursuing a chosen trade or business is "sufficient to constitute a 'tangible change in status' and implicate a protected liberty interest." *Cmty. Fin. Servs. Ass'n of*

*Am.*, 132 F. Supp. 3d 98, 123 (D.D.C. 2015).  The Constitution protects an individual's "right to follow a chosen trade or profession" without governmental interference.  *Kartseva v. Dep't of State*, 37 F.3d 1524, 1529 (D.C. Cir. 1994) (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895-96 (1961)).  Government action that has the effect of "seriously affecting, if not destroying" a plaintiff's ability to pursue his or her chosen profession or "substantially reducing the value of his [or her] human capital," thus infringes a liberty interest.  *O'Donnell v. Barry*, 148 F.3d 1126, 1141 (D.C. Cir. 1998) (internal citations omitted).  Indeed, "[t]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within both the 'liberty' and 'property' concepts of the Fifth and Fourteenth Amendments."  *Greene v. McElroy*, 360 U.S. 474, 492 (1959); *see also Wilkerson v. Johnson*, 699 F.2d 325, 328 (6th Cir. 1983); *Grand Traverse Band of Ottawa & Chippewa Indians v. Director, Mich. Dep't of Natural Resources*, 1998 U.S. App. LEXIS 15145, at **15-16 (6th Cir. July 1, 1998) (finding that deprivation of ability to commercially harvest fish from traditional fishing areas by the denial of mooring at marinas was an interest that may serve as a basis for constitutional relief); *Mallinckrodt Inc. v. United States FDA*, 2015 U.S. Dist. LEXIS 193019, at *59 (D. Md. July 29, 2015) (suggesting that plaintiffs may have a constitutionally protected property interest in their ability to sell their product lawfully in interstate commerce).  This liberty interest applies to corporations as well as to individuals.  *See Trifax Corp. v. Dist. of Columbia*, 314 F.3d 641, 643-44 (D.C. Cir. 2003) (observing that the Due Process Clause's "'liberty concept' protects corporations as well as individuals" and that "government stigmatization that broadly precludes individuals or corporations from a chosen trade or business deprives them of liberty in violation of the Due Process Clause").

43

For example, in *Community Financial Services Association of America*, payday lenders challenged federal banking agencies' informal guidance documents that allegedly attempted to force banks to terminate relationships with the payday lenders.  132 F. Supp. 3d at 106-07, 110-111.  The court held that the payday lenders had sufficiently alleged a denial of due process – stigmatization – which deprived them of their interests in obtaining bank accounts and pursuing their chosen line of business.  132 F. Supp. 3d at 123.  The court determined that the FDIC implicated the lenders' protected interest in pursuing their chosen line of business, holding that when an administrative agency takes action meant to target a third party, the impact is "neither 'indirect' nor 'incidental,' and such acts are "more analogous to an adjudication of payday lenders' right to do business."  *Id.* at 122.  Thus, a party alleging that an administrative agency took "actions for the direct purpose of putting them out of business" sufficiently states a claim for which due process protections apply.  *Id.* at 122-23.

Here, Congress has specifically recognized the right of tobacco product manufacturers to participate lawfully in interstate commerce by forbidding FDA from banning those categories of tobacco products initially covered by the Tobacco Control Act (prior to the Deeming Rule) as a class or requiring the reduction of nicotine yields of a tobacco product to zero.  21 U.S.C. § 387g(d)(3)(A)-(B).  Vapor Stockroom and the VTA's other manufacturer members want to comply with the PMTA requirements.  However, as described above in the context of Plaintiffs' APA claims, FDA has set Plaintiffs—as well as the entire vapor industry—up for failure by simultaneously failing to publish long-promised foundational rules governing the contents of PMTAs for vapor products while proposing a highly accelerated deadline for their submission, repeatedly changing its non-binding recommendations regarding such basic items as HPHC testing, and failing to account whatsoever for the practical impossibility of concluding all of the

testing and studies required for a "high quality" PMTA within the ten-month time frame.  Absent

court intervention, as of May 12, 2020, manufacturers of millions of vapor products that are not

targeted toward youth—the issue FDA claims to be addressing—will be forced to withdraw their

products from the market lest (as discussed below) they face civil or even criminal penalties for

marketing "adulterated" tobacco products.  Such will be the case not because the manufacturers

have been dilatory, but because FDA's arbitrary ten-month deadline provided insufficient time to

finalize and submit PMTAs that are of sufficiently "high quality" to receive approval from FDA.

Thus, FDA has deprived Plaintiffs of their protected rights.

> **b.    FDA deprived Plaintiffs of their liberty and property interests without an opportunity to be heard regarding the grossly accelerated PMTA deadline.**

Once a protected liberty or property interest is identified, "[t]he question, then, becomes,

'what process is due[?]'" *Foster v. United States EPA*, No. 2:14-cv-16744, 2015 U.S. Dist.

LEXIS 132535, at *13 (S.D.W.V. Sept. 30, 2015) (quoting *Morrissey v. Brewer*, 408 U.S. 471,

481 (1972)).  Determining what procedures are required to ensure due process entails balancing:

"first the private interest that will be affected by the official action; second the risk of an

erroneous deprivation of such interest through the procedures used and the probable value, if

any, of additional or substitute procedural safeguards; and finally the government's interest."

*Cahoo*, 912 F.3d at 902 (*quoting Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

"A basic principle of administrative law is that, barring extraordinary circumstances, the

agency itself must supply appropriate due process protections in the first instance."  *Foster*, 2015

U.S. Dist. LEXIS at *17 (citing *Georator Corp. v. EEOC,* 592 F.2d 765, 768 (4th Cir. 1979)

("[W]hen governmental agencies adjudicate or make binding determinations which directly

affect the legal rights of individuals, it is imperative that those agencies use the procedures which

have traditionally been associated with the judicial process.")).   There is a "failure of due process" where "it cannot be said that the procedure adopted, fairly insures the protection of the interests of absent parties who are to be bound by it."   *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940)).

The fundamental elements of procedural due process are notice and an opportunity to be heard.   *Yellow Freight Sys. v. Martin*, 954 F.2d 353, 357 (6th Cir. 1992) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).   "It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'"   *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (quoting *Baldwin v. Hale*, 68 U.S. 223, 1 Wall. 223, 233, 17 L. Ed. 531 (1864)).   "These essential constitutional promises may not be eroded."   *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004).   "A hearing is not meaningful without a chance "to rebut the [g]overnment's factual assertions before a neutral decisionmaker.'"   *Hicks v. Colvin*, 214 F. Supp. 3d 627, 636 (E.D. Ky. 2016) (quoting *Hamdi*, 542 U.S. at 636).

As discussed above, Section 4 of the APA, 5 U.S.C. § 553, explicitly requires an agency to give impacted parties notice and an opportunity to be heard before it issues binding rules.  The Maryland litigation did not include as a party Plaintiffs or, indeed, even a single entity that would be required to comply with the TCA's PMTA requirements.   Indeed, to the contrary, the Maryland District Court denied various manufacturers' and other organizations' requests for leave to intervene on the ground that they had failed to show that FDA could not adequately represent their interests, that their rights would not be impaired until a remedy was proposed and ordered by the court, and that, because any remedy would supposedly involve further action by FDA, they would have "ample opportunity to be heard regarding the deadlines the FDA proposes

to implement."  Letter Order, Doc. No. 84 in Case No. 8:18-cv-883-PWG (D. Md. May 31, 2019).  Following that decision by the Maryland District Court, FDA circumvented the notice and comment requirements mandated by both the APA and the Due Process Clause and superfluously encouraged the Maryland District Court to issue a binding compliance date without giving the impacted manufacturers any voice in that process.  FDA's actions deprived Vapor Stockroom and other VTA members of their ability to engage in a lawful business without having an opportunity to be heard, and thus violated their Fifth Amendment due process rights.

> **2.    FDA's failure to give fair notice of what is required for a "high quality" PMTA violates Plaintiffs' Fifth Amendment due process rights.**

In addition to its deprivation of Plaintiffs' due process rights through its superfluous suggestion of a ten-month PMTA deadline to the Maryland District Court, FDA has also fallen short of the Fifth Amendment's requirements in a second way—by failing to provide Plaintiffs fair notice of what is required for an acceptable, "high quality" PMTA sufficient to justify a marketing authorization order.  Constitutional due process requires that "laws which regulate persons or entities . . . give fair notice of conduct that is forbidden or required."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also Connally v. General Constr. Co.*, 269 U. S. 385, 391 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.").  This requirement of clarity in regulation is essential to the protections provided by the Fifth Amendment's Due Process Clause.  *See United States v. Williams*, 553 U. S. 285, 304 (2008) ("Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment.").

4852-5920-7587.1

A regulation must thus provide a person of ordinary intelligence fair notice of what is commanded or prohibited so that he or she will not have to guess as to its meaning and may act accordingly. *FCC v. Fox Television Stations, Inc.*, 567 U.S. at 253; *accord Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982); *Fleming v. United States Dep't of Agriculture*, 713 F.2d 179, 184 (6th Cir. 1983); *Diebold, Inc. v. Marshall*, 585 F.2d 1327, 1336 (6th Cir. 1978). "When the persons affected by the regulations are a select group with specialized understanding of the subject being regulated[,] the degree of definiteness required to satisfy due process concerns is measured by the common understanding and commercial knowledge of the group." *Fleming*, 713 F.2d at 184. "It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158-159 (2012). When a law is so "standardless that it authorizes or encourages seriously discriminatory enforcement," the law does not comport with due process. *United States v. Williams*, 553 U.S. at 304; *see FCC  v. Fox Television Stations, Inc.*, 567 U.S. at 240.

Here, Section 910 of the FDCA requires that a PMTA include, *inter alia*, "full reports of all information published or known to, or which should reasonably be known to, the applicant, concerning investigations which have been made to show the health risks of such tobacco product and whether such tobacco product presents less risk than other tobacco products" and "such other information relevant to the subject matter of the application as the Secretary may require." 21 U.S.C. § 387j(b)(1)(A), (G). FDA has failed to publish even a draft binding

48

regulation specifying what the foregoing statutory language requires.  While FDA has now only recently published the recommendations in its non-binding Final ENDS PMTA Guidance, even with the Guidance, significant questions remain regarding the evidence that is needed for a PMTA to be considered "high quality" and sufficient to justify a marketing authorization order under the amorphous "appropriate for the protection of the public health" standard.  As discussed above, these include: (i) the applicable good manufacturing standards for product quality, supply chain assessment, and product testing; (ii) the methods or assumptions that should be incorporated into the environmental assessment required by 21 C.F.R. § 25.15; (iii) when it may be appropriate to conduct a bridging study to bridge data from a study of one vapor product to another; (iv) the definitive list of HPHCs for which aerosol testing must be conducted; (v) acceptable methodologies and protocols to conduct aerosol testing on devices and e-liquids, including standard device or device settings for testing of e-liquids and standard e-liquids for testing of "open-system" devices and "heavy" and "light" use patterns for HPHC testing; (vi) how to deal with testing for HPHCs for which the technologically feasible minimum limits of detection exceed the population-level threshold levels of concern for toxicity; and (vii) how to design and execute a behavioral study that is nationally representative.  In short, FDA's Final ENDS PMTA Guidance reads more like an open-ended FDA wish list of every potential study that could possibly bear on the question of appropriateness for the protection of the public health than a well-defined checklist of standardized requirements that would provide a person of ordinary intelligence fair notice of what is required to submit a PMTA sufficient to justify a marketing authorization order.   By requiring Vapor Stockroom and the VTA's other manufacturer members to "divine the agency's interpretations [regarding PMTA requirements] in advance," *Christopher*, 567 U.S. at 158-59, or otherwise face voluntarily removing their

49

products from the market to avoid enforcement action, FDA has failed to give fair notice of what is required for a "high quality" PMTA sufficient to justify a marketing authorization order and so has violated Plaintiffs' Fifth Amendment due process rights.

For all of the reasons stated, FDA has violated the APA and Plaintiffs' Fifth Amendment due process rights and Plaintiffs are likely to succeed on the merits of their claims.  The first factor weighs heavily in favor of injunctive relief.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE INJURY ABSENT INJUNCTIVE RELIEF

Without the injunctive relief they request, Plaintiffs will suffer irreparable injury.  To demonstrate irreparable harm, a plaintiff must show that unless an injunction is entered, a plaintiff will likely suffer harm that is "actual and imminent," rather than "speculative or unsubstantiated."  *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).  "'A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages.'"  *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Certified Restoration*, 511 F.3d at 550).  Here, Plaintiffs will suffer irreparable harm absent the requested injunctive relief for three distinct reasons, each of which is independently sufficient to satisfy the irreparable injury prong.

### A.    Plaintiffs Will Suffer Irreparable Injury From the Loss of Their Businesses.

First, threatened financial ruin or loss of a business constitutes an irreparable injury. *Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1382-83 (6th Cir. 1995).  While mere financial damages are not sufficient to qualify as irreparable injury, where the threatened loss is so significant that it would "threaten the existence of the movant's business," the damage qualifies as irreparable.  *Id.* (internal quotations omitted); *see also Warren v. City of Athens*, 411

F.3d 697, 711 (6th Cir. 2005) (affirming that city's violation of plaintiff's due process rights that would result in plaintiff's financial ruin was sufficient irreparable injury).

Here, absent injunctive relief, Vapor Stockroom and the VTA's other members will suffer irreparable harm because they will not be able to continue operations as ongoing businesses after May 12, 2020.[13]  This is the case because, after that date, the tobacco products, including vapor products, that are marketed in the United States without a marketing authorization order from FDA will be considered "adulterated" in violation under Section 902(6) of the FDCA, 21 U.S.C. § 387b(6).[14]  The FDCA prohibits the manufacture, introduction into, delivery for introduction into, and receipt in interstate commerce of any tobacco product that is adulterated.  21 U.S.C. § 331(a), (c), (g).  Title 21, United States Code § 333 subjects an offender to civil monetary penalties of up to $15,00 for each violation, up to $1,000,000 for all violations adjudicated in a single proceeding, 21 U.S.C. § 333(f)(9)(A), as well as potential criminal liability, 21 U.S.C. § 333(a)(1).  All of the vapor products manufactured by Vapor Stockroom and the VTA's other members will be considered "adulterated" if they do not have an acceptable PMTA filed with FDA by May 11, 2020, and as described above, because FDA arbitrarily accelerated the deadline for PMTA filings by twenty-seven months, it will be impossible for these manufacturers to submit complete PMTAs by the deadline.  The very existence of Vapor Stockroom's and the other VTA members' businesses will thus be threatened because they will no longer be able to sell their products.

---

[13]  Similarly, if VTA has no members, it will also not be able to continue its function as an industry trade association.

[14] Section 902(6) of the FDCA provides that a tobacco product "shall be deemed adulterated if-- . . . it is required by Section 387j(a) of this title [FDCA Section 910(a)] to have premarket review and does not have an order in effect under section 387j(c)(1)(A)(i) [FDCA Section 910(c)(1)(A)(i)] of this title."  21 U.S.C. § 387b(6).

FDA itself acknowledges that vapor product manufacturers are already disadvantaged and uniquely at risk of being knocked out of the market.  In arguing against an overly accelerated PMTA deadline, FDA offered the following testimony:

> For ENDS PMTAs, these are first-ever applications for a previously novel and unregulated category of products.  Thousands of these applications are expected to be submitted very close in time.  This expectation is based on the dynamics of the deadline coming earlier than many applicants previously anticipated.  Many applicants will be newly regulated entities lacking experience with FDA, and based on our experience to date, the applications are anticipated to be lower in quality and less complete than current day applications for other FDA regulated products.

(Zeller Declaration, Exh. B to Complaint, ¶ 18.)

In fact, with the exception of the largest traditional tobacco manufacturers, all of the companies submitting PMTAs will be "newly regulated entities" submitting their "first-ever applications" of the kind demanded by FDA.  The enormous investments in these new companies and their "novel" products will have been wasted unless they are provided a reasonable opportunity in a reasonable period of time to produce what FDA demands: "high quality" PMTA applications.  The threatened financial ruin confronting these manufacturers supports the issuance of a preliminary injunction.

### B. Plaintiffs Will Suffer Irreparable Injury Because Sovereign Immunity Prevents Them from Ever Recovering Monetary Damages from FDA.

Second, even if the very existence of Vapor Stockroom's and the other VTA members' businesses were not threatened, the doctrine of sovereign immunity means that Plaintiffs will never be able to recover monetary damages for FDA's illegal actions.  As the United States District Court for the District of Columbia has noted, "[w]here a plaintiff cannot recover damages from an agency because the agency has sovereign immunity, 'any loss of income suffered by [the] plaintiff is irreparable *per se*.'"  *Smoking Everywhere, Inc. v. United States*

*FDA*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010) (quoting *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008), and enjoining FDA from barring the importation of vapor products into the United States as unapproved new drugs or medical devices).  As that court noted:

> Absent a waiver, sovereign immunity shields the federal government and its agencies, like FDA, from suit.  *FDIC v. Meyer*, 510 U.S. 471, 475, 114 S. Ct. 996, 127 L. Ed. 2d 308 (1994).  The APA, of course, waives sovereign immunity for federal agencies but only in actions "seeking relief other than money damages." 5 U.S.C. § 702.  Even though the Federal Tort Claims Act ("FTCA") waives immunity for damages in some instances, it does not do so here.  Claims "based upon an act or omission of an employee of the Government . . . in the execution of a statute or regulation, whether or not such statute or regulation be valid," as well as claims arising out of "interference with contract rights," both of which would most likely apply in this case, are excluded from the FTCA's general waiver of sovereign immunity for torts. 28 U.S.C. § 2680(a), (h).  There being no apparent avenue for obtaining damages against FDA, any economic loss suffered by plaintiffs due to the detention or refused admission of their products can never be recovered and is therefore irreparable.

*Id.*; *see also E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1116 (N. D. Cal. 2018) (citing *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018), and observing that, "[a]s the Ninth Circuit recently reiterated, the general rule that '[e]conomic harm is not normally considered irreparable' does not apply where there is no adequate remedy to recover those damages, such as in APA cases.").

Here, absent injunctive relief, Vapor Stockroom and the VTA's other members will be obligated to remove their vapor products from the U.S. market after May 12, 2020, lest they expose themselves to civil or even criminal liability because such products are "adulterated." Alternatively, these industry stakeholders will need to spend millions of dollars attempting to prepare PMTAs that, because of the arbitrarily accelerated deadline proposed by FDA, will necessarily be incomplete at the time when they need to be submitted.  Regardless of whether the resulting damages are measured as lost profits from businesses that are forced to close because they have not submitted a PMTA by May 11, 2020, or by the millions of dollars that these

businesses futilely spend on necessarily incomplete PMTA submissions, just as in *Smoking Everywhere*, Vapor Stockroom and the VTA's other members will never be able to recover damages from FDA because of the sovereign immunity that insulates FDA from claims for damages. Plaintiffs' threatened damages thus constitute *per se* irreparable harm and support the issuance of an injunction.

### C. Plaintiffs Are Suffering Irreparable Injury Through the Violation of Their Constitutional Due Process Rights.

Third, it is well established that "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *ACLU v. McCreary Cty.*, 354 F.3d 438, 445 (6th Cir. 2003) ("In *Elrod v. Burns*, 427 U.S. 347, 373, 49 L. Ed. 2d 547, 96 S. Ct. 2673 (1976), the Supreme Court held that when reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated."). Here, as noted above, FDA's actions not only contravene the APA's statutory requirements, but also violate Plaintiffs' Fifth Amendment due process rights. Because FDA's actions threaten Plaintiffs' constitutional due process rights, the threatened injury is irreparable in nature.

For the foregoing reasons, absent injunctive relief, Plaintiffs will suffer irreparable injury by being required to remove their vapor products from the market after May 12, 2020. The second factor also weighs heavily in favor of the requested injunctive relief.

### III. THE REQUESTED INJUNCTIVE RELIEF WILL NOT CAUSE SUBSTANTIAL HARM TO THIRD PARTIES OR TO FDA.

Plaintiffs' requested preliminary injunction requiring FDA to establish a rule governing the submission of PMTAs pursuant to a notice and comment process, setting a reasonable deadline for the filing of PMTAs following the finalization of that rule, and prohibiting FDA

from taking enforcement action against any vapor products for failure to file a PMTA until the new deadline would not cause substantial harm to third parties or to FDA. The requested injunctive relief would merely preserve the status quo pending the completion of the appropriate, science-based regulatory action that FDA has promised for the last two years in manner that complies with the APA and Plaintiffs' due process rights. No government agency can or should assert that performing its notice and comment obligations would cause it any harm, much less substantial harm. Rather than harm FDA, the requested injunction would benefit FDA by allowing it to engage in an orderly, science-based review of the vapor products currently on the U.S. market. Further, following these procedures will benefit third parties by allowing them to weigh in on FDA's planned regulatory actions in an organized, transparent fashion.

The imposition of a ten-month deadline will lead to exactly the same dire outcomes about which FDA states it is concerned. In the Zeller declaration filed with the Maryland District Court, FDA indicated that a four-month deadline for the filing of PMTAs would cause FDA implementation challenges because of "programmatic and logistical considerations." Zeller Decl., Exh. B to Complaint, ¶ 16. Director Zeller testified that it would be very difficult for CTP to "receive and review large numbers of applications without being able to meaningfully prioritize among them" and that he was particularly concerned about "low quality applications, many of which could be time-consulting to review due to their poor quality" from manufacturers of a "previously novel and unregulated category of products." *Id.*, ¶¶ 17, 18.

Based on FDA's experience with provisional substantial equivalence applications, of which approximately 3,000 were submitted within the last several days leading up to a filing deadline in 2011, FDA stated that "there is no doubt that the agency will be flooded with applications leading up to any court-ordered deadline." *Id.*, ¶ 19. He predicted that such "will

undoubtedly put a strain on the agency" because "a large volume of incomplete or haphazard applications in which information is not clearly presented or is missing data will . . . divert valuable agency resources into the painstaking effort of reviewing those submissions and communicating deficiencies." *Id.*, ¶¶ 18-19.  FDA indicated that "[a]dditional time to file applications would provide more planning time for FDA and applicants, more time to build out operational systems, and more time to issue guidance and rules to reduce the volume of low-quality applications." *Id.*, ¶ 19.

Given the foregoing, the relevant question is then whether a ten-month (rather than a four-month) deadline would alter the outcome about which FDA is concerned.  As discussed in Section A.1.b. and c., above, and in the supporting declaration of Dr. Stacey Benson, the short answer is no—because of both a lack of clarity from FDA on the requirements and a multitude of technical difficulties and third-party resource constraints, manufacturers simply will be unable to complete their applications by May 11, 2020, and instead will be forced to submit whatever information they can by the deadline.  The unavoidable result will be that applications will be "incomplete," "haphazard," with "information not clearly presented," and with "missing data"— all of the concerns that drove FDA's opposition to the proposed four-month deadline in the Maryland District Court.  As noted above, while FDA speculates that a ten-month deadline might "make it feasible for more manufacturers to develop and submit complete and high quality applications,"  Zeller Decl., ¶ 13, FDA does not (and cannot) estimate how many manufacturers might be able to do so—especially in light of the lack of finalized (or even proposed) rules articulating the requirements for a "complete" application.

An injunction requiring FDA to issue exactly such clarifying rules and to set a reasonable submission deadline following their finalization before taking enforcement action against vapor

56

products so that applicants can submit "high quality" PMTAs is exactly what Plaintiffs seek here. Far from harming FDA, such an injunction would more properly account for FDA's programmatic and logistical considerations and thus actually benefit FDA in its day-to-day operations. Because no third parties, including FDA, would suffer any substantial harm as a result of the requested relief, and, in fact, FDA would benefit therefrom, the third factor also weighs heavily in favor of Plaintiffs' requested preliminary injunction.

## IV. THE REQUESTED RELIEF WILL SERVE THE PUBLIC INTEREST, INCLUDING BY PREVENTING THE "MASS MARKET EXIT" OF VAPOR PRODUCTS WHICH FDA SAID "SHOULD BE AVOIDED IF AT ALL POSSIBLE."

Plaintiffs' requested injunctive relief also serves the public interest by ensuring that vapor products remain available to adult former smokers who are addicted to nicotine and depend on such products to avoid reverting back to smoking cigarettes—the outcome that FDA says "should be avoided if at all possible". Further, remedying constitutional violations, including violations of the Fifth Amendment's Due Process Clause, is always in the public interest. Finally, it is in the public's interest to ensure that federal administrative agencies, such as the FDA, comply with the APA's requirements before making determinations that can decimate an entire industry and lead to the loss of tens of thousands of jobs.

### A. An Injunction Would Ensure Adult Former Smokers' Continued Access to a Significantly Less Harmful Alternative to Combustible Cigarettes.

The public threat of removing vapor products from the market has been clearly articulated by Defendants themselves and by independent public health experts. Further, the submission of PMTAs will have little direct bearing on the issue of illegal use of vapor products by youth, for which FDA has more effective regulatory tools at its disposal.

      1.      **FDA itself has declared the public health threat that will be realized by the sudden removal of vapor products from the market.**

First, the public health threat from the sudden removal of vapor products from the market has been clearly articulated by FDA itself.  FDA has directly tied a PMTA application deadline too short in time to increased smoking.  In his sworn declaration, FDA CTP Director Zeller said it was his "firm belief" that a four-month PMTA submission deadline "creates a genuine risk of migration from potentially less harmful ENDS products back to combustible tobacco products within the population of addicted adult smokers who have completely switched to ENDS." (Zeller Decl., ¶ 12.)

FDA could not have been clearer about the adverse public health impact of a precipitously shortened PMTA filing deadline leading to the "mass market exit" of vapor products, even if companies which are unable to comply within a grossly accelerated timeframe are later able to return to the market:

> ***Mass market exit*** of such products would limit the availability of a potentially less harmful alternative for adult smokers seeking to transition or stay away from combustible tobacco products.  Dramatically and precipitously reducing availability of these products ***could present a serious risk that adults***, especially former smokers, who currently use ENDS products and are addicted to nicotine ***would migrate to combustible tobacco products, even if particular ENDS products ultimately receive marketing authorization and return to the market later.***  And, although these has been great recent progress in declining use of cigarettes for all age groups, ***I am concerned that these declines could be slowed or reversed in the case of very sudden and very dramatic reductions in availability.***

(Zeller Decl., ¶ 15 (emphases added).)  For all of these reasons, FDA concluded that such a "mass market exit" is "a public health outcome that should be avoided if at all possible[.]"  Id., ¶ 12.

Second, a comprehensive study of all peer-reviewed literature on vapor products commissioned by FDA and conducted by the National Academies of Sciences, Engineering, and

Medicine has found that, "across a range of studies and outcomes, e-cigarettes pose less risk to an individual than combustible tobacco cigarettes," including conclusive evidence that substituting such products for combustible cigarettes "reduces users' exposure to numerous toxicants and carcinogens" and substantial evidence that switching results in reduced short-term adverse health outcomes in several organ systems.  This less harmful risk profile has not been lost on adult cigarette consumers, as since vapor products became widely available in the United States starting in 2009, the number of smokers of combustible cigarettes as a percentage of the U.S. population has dropped from 20.6 percent to only 14 percent by 2017.  (VC, ¶ 30.)

Third, FDA's public statements since 2017 have reflected the importance of the continued availability of vapor products as a potentially less harmful alternative to combustible cigarettes as central to FDA's plan to continue to reduce the harm to public health caused by the combustible cigarette—the leading cause of preventable death and disease in the United States. (VC, ¶¶ 64-66, 73.)

The serious public health concerns about which FDA warns are equally applicable under the new 10-month application deadline.  For the overwhelming majority of affected companies, because of the impossibility of preparing any, much less "high quality" or complete PMTAs, on a ten-month deadline, there is zero practical difference between the four-month compliance period that CTP Director Zeller was addressing in his declaration and the May 11, 2020 deadline that Plaintiffs now confront.  As set forth in detail in the Benson Declaration, myriad real world and practical limitations will prevent the overwhelming majority of companies from even participating in the PMTA process in a meaningful fashion and will prevent even the most sophisticated companies from filing complete applications.  Benson Decl., ¶¶ 21, 22.

FDA cannot now argue that a ten-month deadline will avoid the public health crisis about which it warned.  FDA already has admitted that, at best, the ten-month deadline may only make it "feasible" for "more" companies to comply.  Zeller Decl., ¶13.  While that may be true, it is of little comfort to Vapor Stockroom or to the thousands of other registered manufacturers responsible for filing PMTAs given the facts highlighted above which FDA clearly did not consider since FDA did not seek any input from stakeholder *prior to* moving forward with a grossly accelerated ten-month deadline.

Until FDA issues its foundational rules further clarifying what an applicant must show to meet the "appropriate for the protection of the public health" standard, addresses the technical challenges presented by limited laboratory capacity and changing recommendations for PMTA contents, and only *then* allows manufacturers a reasonable period of time to conduct necessary tests and studies and prepare their submissions, neither timeline provides a meaningful opportunity for applicants to prepare or submit a "high quality" PMTA to FDA.  Because of the threat of enforcement action that can include civil and even criminal penalties, without injunctive relief, the "mass market exit" of vapor products that FDA itself warns is a "public health outcome that should be avoided if at all possible" is virtually a foregone conclusion.

> **2.    Independent public health experts have concluded that the ten-month PMTA deadline and FDA's failure to establish rational rules will drive vapor products from the market, adversely impact public health, and lead to serious black market consequences.**

In the wake of FDA's proposal of the ten-month deadline, Iowa's Attorney General, Thomas Miller (D), along with eleven independent public health experts, wrote Defendant HHS Secretary Azar to emphasize that FDA's current PMTA process "is about to kill-off or severely degrade one of the most important new technologies for public health in the United States."  *See* Letter from Iowa Attorney General Thomas Miller, et al. to HHS Secretary Alex M. Azar II,

dated July 24, 2019, attached hereto as Exhibit 4 ("Public Health Expert Letter"), at 1.[15]  These independent public health experts opined that such would occur because the "compressed [PMTA] timetable," FDA's "unclear" PMTA application requirements, and the "excessive costs and burdens of FDA's pre-market tobacco application (PMTA) process threaten to remove almost all companies and products from the market."  *Id*. at 2. Attorney General Miller speaks with authority on this issue given the fact that he has been a leader in the decades-long campaign "to reduce the enormous death toll and financial costs of tobacco addiction and disease" and "he was a leader in the multistate settlement agreement that resulted in the tobacco industry paying billions of dollars to the states and changing the way it conducts business."[16]

While AG Miller and the other public health experts who signed the Public Health Expert Letter share FDA's concern regarding illegal use of vapor products by youth, they counseled "against a damaging overreaction," including eliminating vapor products that are beneficial to adults.  *Id.* at 2.  AG Miller's letter further echoed FDA's and Plaintiffs' concern that under the "compressed timetable" for submitting PMTAs – and the burdens the PMTAs place on applicants – "almost all industry participants and products will exit the regulated market."  *Id.* The result, according to these public health leaders, would be not only increased combustible cigarette consumption, as also predicted by FDA, but also the creation of potential black market:

> The likely effect is that some fraction of the 12 million vapers will revert to exclusive smoking thereby causing a detriment to public health, that a major

---

[15] The letter is publicly available at:

https://www.iowaattorneygeneral.gov/media/cms/PMTA_letter__190724__headed_45164DED1 A0BA.pdf?fbclid=IwAR1LWHaNyDhPNLnEyK9O0hDTdggXTAiVlINOxeNyz6- WJ38WmeduXNIr0pk (last visited Aug. 22, 2019).  AG Miller's letter may be considered by the Court under the public record exception to the hearsay rule.  *See* Fed. R. Evid. 803(8).

[16] Iowa Department of Justice, Office of the Attorney General, "About Attorney General Tom Miller,"  https://www.iowaattorneygeneral.gov/about-us/about-attorney-general-tom-miller  (last accessed September 1, 2019).

unregulated black market will form, and that innovation in the lawful regulated marketplace will be severely curtailed, but will continue unabated outside the United States, notably in Canada, China, and Europe, and thus drive further development of a US black market.

*Id.* at 2.

Importantly, these public health leaders called into question the manner in which FDA was failing to address the overarching public health concerns through its current PMTA process and they offered a detailed "Briefing: A Crisis in 2020:  The Impact of Excessive FDA Regulation of Vaping Products and Public Health" document which, among other things, implored FDA to "immediately revisit and review" its prior regulatory impact analysis" and to "develop a viable and proportionate route to market for vaping products." *Id.*  To this end, these public health experts concluded that "more time is required . . . for businesses to prepare" and that the 10-month deadline imposed an "impractical timetable."  *Id.*

To put the FDA's warnings about the "mass market exit" of vapor products that "should be avoided if at all possible" in perspective, this Court should also consider the sobering assessment offered by AG Miller and the public health experts:

> Even after 50 years of progress, smoking remains a devastating burden on American families. According to the Centers for Disease Control and Prevention, more than 16 million Americans live with a smoking-related disease and smoking causes more than 480,000 deaths per year.  That is more than HIV, alcohol, illicit drug use, motor vehicle accidents, and firearms *combined*. The costs are enormous – over $300 billion annually for healthcare ($170 billion) and in low productivity ($156 billion). The costs in lost life, pain and grief are incalculable. The burdens fall most heavily on disadvantaged groups, with higher rates of smoking among those who are economically deprived, have poor educational attainment, LGBT status, no health insurance, a disability or suffer mental distress.

Public Health Expert Letter at 1.

### 3. PMTA applications have little material relevance to addressing illegal youth use of vaping products and this concern does not outweigh the "genuine risk" that former smokers will start again.

The primary public health issue that FDA attempted to use to justify its grossly accelerated PMTA deadline was the protection of youth. Like FDA, Plaintiffs are also concerned about the already illegal use of vaping products by youth. Indeed, to prevent such from occurring, VTA developed and published in January 2018 its "Marketing Standards for Membership" setting forth twelve marketing standards intended to prevent minor access to vapor products and ensure that all marketing of such products is directed only to adults to the greatest extent possible. *See* Declaration of Tony Abboud, Exh. 3, at ¶ 5. As a VTA member, Vapor Stockroom adheres to the marketing standards in its own operations. *Id*.

However, grossly accelerating the PMTA deadline is not an action appropriately tailored to address youth initiation. In articulating their concerns about the grossly accelerated PMTA deadline, AG Miller and the public health experts explained that, "Youth vaping should be addressed with youth-oriented measures – not through excessively burdensome regulatory regime for products that are beneficial to adults and promise to roll-back the epidemic of smoking related disease." Public Health Expert Letter at 2.

To be clear, the filing of PMTAs will have little material relevance to addressing the illegal use of vaping products by youth for a number of reasons. First, of the myriad scientific tests, studies, research, and surveys to support a PMTA recommended by FDA in its Final ENDS PMTA Guidance, the only one that may have even a marginal bearing on youth initiation is the narrow subset of the many behavioral studies that FDA demands. In other words, PMTA applications will provide product-specific and applicant-specific information to FDA, but will

not individually inform the larger issues of the appeal to youth of, or youth access to, vapor products.

Second, FDA, by its own admission, has other, far more effective tools at its disposal than a PMTA application.  For example, ostensibly to limit youth initiation of vaping products, FDA began a regulatory process through the publication of an Advance Notice of Proposed Rulemaking ("ANPRM") on March 21, 2018, to collect scientific data on the role of flavors in vapor products.  Abboud Decl., ¶ 8.  This ANPRM is a proper regulatory process, which FDA initiated but has since let stand idle, for the establishment of product standards for flavors under Section 907 of the TCA, 21 U.S.C. § 387g.  In its comments submitted to FDA in response to the ANPRM on July 19, 2018, VTA also suggested other, even more direct measures that FDA could take to combat youth vaping, including requiring online retailers to conduct third-party authentication of a purchaser's age, more rigorously restricting improper sales of vapor products through online third-party marketplaces, issuing more "no tobacco sale" orders against repeat violators, and imposing additional marketing and advertising restrictions along the lines of those set forth in VTA's Marketing Standards for Membership.  *Id*., ¶¶ 9, 11.  Unfortunately, FDA has not responded to the tens of thousands of comments on this ANPRM, nor has FDA initiated an annual notice of proposed rulemaking on flavors—something that FDA repeatedly has said is critical to protecting youth.  *Id*., ¶ 12.

Instead of pursuing the rulemaking process it started, FDA pivoted in March 2019 and published a draft guidance entitled "Modifications to Compliance Policy for Certain Deemed Tobacco Products" ("March 2019 Draft Guidance").  *Id*., ¶ 13.  As occurred with the ANPRM, FDA has received thousands of comments in response to the March 2019 Draft Guidance, but has not yet responded to them.  For its part, the VTA responded by warning that FDA was using

the March 2019 Draft Guidance to circumvent the proper rulemaking process associated with tobacco product standards.  *Id*., ¶ 14.  Regardless, by its own admission, FDA has declared that *this* March 2019 Draft Guidance is one of the most important things FDA can do to protect youth.  In his June 12, 2019 declaration, CTP Director Zeller testified:

> FDA expects to complete consideration of the comments, draft the final guidance, and publish it on this highly accelerated 120 day timeframe. . . . .  I believe that finalizing this guidance—which focuses on restricting youth access to flavored ENDS products—is one of the most critical public health steps that FDA can take to curb youth vaping.

(Zeller Decl., ¶¶ 10-11.)  Through this testimony, FDA demonstrated its view that there are other, more important tools, it can utilize to address the youth issue.

Forcing a mass market exodus of vapor products on the current PMTA timetable because of the limited concern of illegal youth use of vapor products would be allowing the baby to be thrown out with the bathwater and, in FDA's own words, precipitate the perverse outcome of "a public health outcome that should be avoided if at all possible."  The threat of hundreds of thousands of former smokers reverting back to combustible cigarettes after May 11, 2020, is a public health concern that weighs strongly in favor of a preliminary injunction.

### B.     An Injunction Would Remedy the Deprivation of Plaintiffs' Constitutional Due Process Rights.

Additionally, the requested injunctive relief would remedy the deprivation of Plaintiffs' due process rights.  "When a constitutional violation is likely, . . . the public interest militates in favor of injunctive relief because 'it is always in the public interest to prevent violation of a party's constitutional rights.'" *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010) (quoting *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)); *accord Am. Freedom Def. Initiative v. Suburban Mob. Auth. for Reg'l Transp.*, 698 F.3d 885, 896 (6th Cir. 2012) ("[T]he public interest is promoted by the robust enforcement of constitutional rights.").

Here, a preliminary injunction would prevent further harm to Vapor Stockroom and the VTA's other members from FDA's violations of the Fifth Amendment's Due Process Clause.

### C.    An Injunction Would Serve the Public Interest by Ensuring that FDA Complies With the APA's Requirements Before Making Determinations that Could Potentially Cost Tens of Thousands of Jobs.

An injunction temporarily maintaining the status quo while FDA clarifies the PMTA requirements would also preserve tens of thousands of jobs in the vapor industry while ensuring that FDA complies with the APA's requirements.  It is well established that there is a strong "public interest in preserving the rights of parties which are affected by government regulation to be adequately informed when their rights are at stake and to participate in the regulatory process as directed by Congress."  *Northwest Mining Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 16 (D.D.C. 1998). In the United States, there are over 87,000 people directly employed in the vapor products industry—primarily at small- and medium-sized businesses—while over another 78,000 people are employed at suppliers of the industry or have jobs that are directly dependent on the vapor industry.  Absent injunctive relief, the vapor industry and these jobs—including not only individuals employed by manufacturers, but also distributors and retailers and those who supply or provide services to them—will be destroyed, causing a substantial nationwide economic impact totaling in excess of $25 billion.  (Dunham Decl., Exh. 2, ¶ 5.)  An injunction that merely preserves the status quo (and these individuals' employment) while requiring FDA to comply with its statutory and constitutional obligations would serve the public interest.

The threat to public health if vapor products are suddenly removed from the U.S. market, preservation of Plaintiffs' constitutional rights, and the preservation of tens of thousands of jobs both in and dependent upon the vapor industry are all public interests that weigh heavily in favor of a preliminary injunction.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should release Plaintiffs from their Hobson's choice, grant Plaintiffs' motion, and enter a preliminary injunction: (i) requiring FDA to establish a proposed and final rule governing the submission of PMTAs and product standards for vapor products through a notice-and-comment rulemaking process; (ii) setting a reasonable, non-arbitrary deadline for the filing of PMTAs pursuant to the final rule; (iii) refraining from taking enforcement action against vapor products on the U.S. market as of August 8, 2016, until the new deadline for filing PMTAs; and (iv) refrain from taking enforcement action based on the failure of vapor product manufacturers to submit a complete PMTA by May 11, 2020.


Respectfully submitted,

THOMPSON HINE LLP


Dated: September 2, 2019        By: _____/s/ Eric N. Heyer_____
                                Eric N. Heyer (admitted *pro hac vice*)
                                Joseph A. Smith (admitted *pro hac vice*)
                                1919 M Street, NW, Suite 700
                                Washington, DC 20036
                                Phone: 202.331.8800
                                Fax: 202.331.8330
                                eric.heyer@thompsonhine.com
                                joe.smith@thompsonhine.com

                                Robert P. Johnson
                                Kentucky Bar No. 86282
                                312 Walnut Street, 14th Floor
                                Cincinnati, Ohio 45202-4089
                                Phone: 513.352.6769
                                Fax: 513.241.4771
                                rob.johnson@thompsonhine.com

                                Stephanie M. Chmiel
                                (*pro hac vice* motion to be filed)
                                41 South High Street

4852-5920-7587.1

Suite 1700
Columbus, OH 43215-6101
Phone:  614.469.3200
Fax: 614.469.3361
stephanie.chmiel@thompsonhine.com

*Counsel for Plaintiffs Vapor Technology Association
and Vapor Stockroom, LLC*