Exhibit 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
Lexington Division

| | | |
|---|---|---|
| VAPOR TECHNOLOGY ASSOCIATION, et al. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 5:19-cv-00330-KKC |
| U.S. FOOD AND DRUG ADMINISTRATION, et al. | ) ) ) | |
| Defendants. | ) ) | |

**DECLARATION OF STACEY M. BENSON, Ph.D.**

I, Stacey M. Benson, Ph. D., do hereby declare as follows:

1.    I am over the age of 18 years and have personal knowledge of the facts set forth below such that I would be competent to testify as to the same if called.

2.    I am an epidemiologist with over 15 years of professional experience conducting, analyzing, and interpreting scientific data using well-accepted scientific methodology. Epidemiology relies on human research to assess the relationship between exposures to a substance or product and the resulting human health impacts.

3.    My areas of expertise include environmental epidemiology, occupational epidemiology, respiratory protection, and clinical research. I received my undergraduate degree (B.S.) in physics from St. Lawrence University, my master's degree (M.S.) in the field of exercise physiology from the University of Pittsburgh, and my Ph.D. in Epidemiology from the University of Pittsburgh.  I have held teaching positions at Carnegie Mellon University and Point Park University and served an Associate Service Fellow at the National Institute for Occupational Safety and Health, where I conducted human subject experiments at the National Personal Protective Technology Laboratory. I have published over 30 scientific articles, presented 28 papers

1

at both national and international conferences, and have been cited in the scientific literature over 400 times.

4.      I currently serve as a Managing Health Scientist and Epidemiology Practice Area Lead at Cardno ChemRisk, a global scientific consulting firm specializing in, among other areas, product health and safety. Cardno ChemRisk is a consulting firm that provides scientific advice to the government, corporations, law firms, and various scientific and professional organizations.

5.      Cardno ChemRisk has been providing consulting services to electronic nicotine delivery systems (ENDS) clients for over five years and is currently supporting clients in their efforts to comply with the Premarket Tobacco Application (PMTA) process. As such, we, and I in particular, are familiar with the PMTA procedures as they stand today, as well as the many challenges and uncertainties facing vapor product manufacturers that are attempting to satisfy the recommendations for PMTAs set forth by the Food and Drug Administration (FDA).

6.      In 2016, the Food and Drug Administration (FDA) released a draft guidance document regarding PMTAs for ENDS (the "Draft ENDS PMTA Guidance"). (FDA, 2016) While the Draft ENDS PMTA Guidance discussed many aspects of the PMTA process, including several types of non-clinical and clinical studies that FDA recommended be completed by applicants, there remained many unanswered questions about, among other issues, various testing protocol requirements, including the testing methodologies that FDA would consider acceptable for carrying out aerosol testing for specified harmful and potentially harmful constituents (HPHCs) under "heavy" and "light" use patterns.

7.      As a result, many vapor product manufacturers, and particularly smaller manufacturers with financial resource constraints, hesitated to plunge into the PMTA process beyond the early planning stages based only on the Draft ENDS PMTA Guidance.

8.    I believe that these manufacturers' hesitancy was understandable, as the Draft ENDS PMTA Guidance indicated in bold at the top of every page as follows:

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

(FDA, 2016).  On the FDA's website, FDA's Center for Tobacco Products indicated that, once the ENDS PMTA Guidance was finalized, "it will represent FDA's current thinking on submitting PMTAs for ENDS products."  (FDA, 2016; accessed June 2019.)

9.    However, it was not until three years later, on June 11, 2019, that FDA released the finalized PMTA guidance document (the "Final ENDS PMTA Guidance").  (FDA PMTA Guidance, 2019.) The Final ENDS PMTA Guidance describes the types of data and information that FDA recommends applicants submit to meet the Tobacco Control Act's (TCA) requirement that a new tobacco product be protective of public health and thus entitled to a marketing authorization order.

10.    As discussed in the Final ENDS PMTA Guidance, a comprehensive assessment of each vapor product requires an evaluation of the short- and long-term human health effects of the product on the population. These investigations include reviews of relevant existing scientific literature, extensive product testing (including aerosol testing), toxicological studies and analysis, stability testing, materials testing, environmental assessments, and human subject research in the form of clinical studies and behavioral testing.  The findings must be generalizable to the U.S. population and include impacts on both users and non-users of the vapor product.  (FDA PMTA Guidance, 2019.)

11.    Although the Final ENDS PMTA Guidance provides some additional insight into how FDA is going to evaluate PMTAs, there are still many issues that have not been resolved.  For

example, FDA has not issued guidance on good manufacturing practices (GMPs) for non-combustible tobacco products, including vapor products. Yet, the Final ENDS PMTA Guidance suggests that the PMTA applicant must demonstrate high standards for product quality through GMPs, supply chain assessment, and product testing. (FDA PMTA Guidance, 2019 at pp. 30-31.)

12.     Similarly, the Final ENDS PMTA Guidance also suggests that applicants must demonstrate through an environmental assessment that their products do not have significant impacts on the environment. (FDA PMTA Guidance, 2019 at p. 23.) But, FDA has not issued guidance on the methods or assumptions that need to be incorporated in such an environmental assessment.

13.     The Final ENDS PMTA Guidance also does not clarify when it may or may not be appropriate to conduct a bridging study to bridge data from a study on one vapor product to another vapor product.

14.     Nor has the Final ENDS PMTA Guidance provided further clarity on the methodologies that should be utilized to conduct aerosol testing of devices or e-liquids. Unlike the situation with combustible cigarettes, ENDS products are fairly new and so do not have any historical data or standardized testing methodologies upon which to draw. Thus, issues regarding protocols for testing and research must still be resolved. By way of example, FDA does not provide a standard device or device settings for e-liquid manufacturers to utilize to conduct aerosol testing of their fluids. The guidance also does not recommend a standard e-liquid or set of e-liquids for open-tank device manufacturers to utilize to conduct aerosol testing of their devices. Instead, FDA only vaguely recommends that applicants conduct tests that reflect a "reasonable range" of conditions. (FDA PMTA Guidance, 2019 at p. 28.) Without further specific direction, the applicant runs the risk of falling short of what FDA expects to see in a PMTA.

15.     These missing details are extremely important as the study design and number of variables to test in non-clinical and clinical studies can greatly influence the costs and time to execute and perform these studies. By way of example, there are several variables that could influence toxicological and clinical study design, execution, and findings regarding product testing: e.g., power settings, airflow settings, humectant composition, flavors, nicotine concentrations, and nicotine type (free base vs. nicotine salts).  Thus, under one possible interpretation of the Final ENDS PMTA Guidance, a clinical study of a closed device with one power setting, one airflow setting, two nicotine concentrations, one propylene glycol to vegetable glycerin ratio, and three flavors would result in having to test six potential use scenarios with the study participants.  This type of study design would likely take 12 to 18 months to plan, perform, analyze and summarize for the PMTA.  Further, a clinical study of an open-tank device with two power settings, two airflow settings, three flavors, three PG/VG ratios, and three nicotine concentrations would be even more involved and result in 108 possible use scenarios. This type of study would likely take several years to complete.

16.     As the number of use scenarios increases, the costs to conduct clinical studies also increases.  Therefore, having an understanding, before developing and filing the PMTA, of what the FDA considers adequate for the range of appropriate testing conditions would be invaluable to the FDA and the applicant in at least two ways: ensuring FDA gets the information it needs to fairly evaluate the product and to set reasonable limitations on the required research so that both parties can optimize the use of limited resources.

17.     For those of us who are working to complete PMTAs, this means that FDA will be required to spend a significant amount of time with each applicant (and the consultants and technicians who are helping them) leading up to the PMTA's submission to work through

5

numerous issues so that the application is appropriately robust and complete for a substantive review by FDA.  Indeed, in the Final ENDS PMTA Guidance, FDA repeatedly urges applicants to "meet with the FDA to discuss the [planned] approach prior to preparing and submitting an application." (FDA PMTA Guidance, 2019 at p. 13). This back and forth will take months, at a minimum, to get the applicant in a place where it can actually start conducting the required studies and research with the knowledge that its efforts will provide useful information to FDA and satisfy the PMTA requirements.

18.     Indeed, product-specific guidance from FDA is particularly important with respect to vapor products because FDA has not approved a single PMTA for a vapor product to date.

19.     Even with an unlimited budget, for any vapor product manufacturer that waited until the Final ENDS PMTA Guidance was published on June 11, 2019, it is now not possible to submit a complete PMTA with each facet that FDA recommends by the ten-month deadline of May 11, 2020 (now nine months away).

20.     A ten-month timeframe for the completion of a PMTA is not feasible or realistic for numerous reasons:

a.     First, as indicated above, there a number of significant open questions regarding good manufacturing practices, environmental assessments, bridging studies, and aerosol testing methodologies—including device settings for e-liquids, e-liquids for open system devices, and regarding "heavy" and "light" use patterns for harmful and potentially harmful constituent testing—that require pre-submission meetings and extensive communication between the applicant and the Office of Science within FDA's Center for Tobacco Products to determine appropriate methodologies and parameters before the recommended testing and studies are even undertaken.  These communications can last months and there is no sense in an applicant even

initiating much of its product testing and studies until it receives particularized guidance from FDA with respect to its planned approach in these areas.

b.    Second, in its Final ENDS PMTA Guidance published on June 11, 2019, FDA materially changed the list of harmful and potentially harmful constituents, or HPHCs, for which it recommends the applicant test its product from the initial list in the Draft ENDS PMTA Guidance published in 2016. Of the 29 HPHCs for which FDA recommended extensive testing in the Draft ENDS PMTA Guidance, eight HPHCs (4-Aminobiphenyl, 1-Aminonaphthalne, 2-Aminonaphthalne, ammonia, anabasine, benzo[a]pyrene, 1,3-butadiene, and isoprene) were removed from the Final ENDS PMTA Guidance and eleven new HPHCs (benzyl acetate, butyraldehyde, ethyl acetate, furfural, glycidol, isoamyl acetate, isobutyl acetate, methyl acetate, N-butanol, priopionic acid, and propylene oxide) were added. (FDA, 2016 at pp. 26-27; FDA PMTA Guidance, 2019 at pp. 28-29.) Testing laboratories must now establish independently validated testing methodologies for these new HPHCs and financial resources spent previously by applicants to test for the eight HPHCs that have now been dropped from the list were spent in vain. Indeed, FDA has further complicated the HPHC picture by, on August 5, 2019—almost two months *after* the Final ENDS PMTA Guidance was published—publishing a notice in the Federal Register seeking comments on whether two further constituents never before identified in either version of the ENDS PMTA Guidance—acetic acid and acetoin—should not also be included in the list of HPHCs for ENDS products because of their potential for adverse respiratory effects. Applicants cannot reasonably be expected to complete and report on their HPHC aerosol testing when the list of HPHCs for which they are supposed to test keeps changing.

c.    Third, as regards HPHC testing, FDA has indicated that it will only accept results from testing laboratories that are compliant with good laboratory practices regulations.

7

(FDA PMTA Guidance, 2019 at p. 34.)  I believe that we at Cardno ChemRisk are as experienced as any scientific consultancy in the world with respect to vapor products and the independent laboratories with meaningful experience conducting aerosol testing of such products.  However, I am aware of only five to six such qualified and accredited laboratories total in the United States, Canada, and the United Kingdom.  Of these, one laboratory does not even have the capability of generating its own aerosol in-house.  Further, of these five to six qualified laboratories, none currently have in place independently validated testing methodologies or assays for all of the newly added HPHCs announced by FDA on June 11, 2019, in the Final ENDS PMTA Guidance.  It is my understanding that the process for obtaining approval for such new methodologies from accrediting laboratory organizations such as the American Association for Laboratory Accreditation may take weeks or even months.

            e.      Fourth, with respect to HPHCs, FDA indicates in its scientific policy memoranda that toxicological evaluation of inhaled tobacco products should be compared against threshold levels of concern for the general population.  (FDA Reference Values, 2019.)  However, the limits of detection with currently available laboratory equipment are substantially greater than the general population-level threshold levels of concern for a number of the HPHCs.  This means that, even with the best equipment, accredited laboratories cannot meaningfully determine whether HPHCs emitted in the aerosol from vapor products exceed the threshold levels of concern without performing thousands of puffs on a single device.  Even if this problem did not exist, given the wide range of vapor products currently on the market, for which I expect PMTAs to be submitted, laboratory capacity for aerosol testing on a 10-month time frame is likely to be exhausted in the near future and leave some potential applicants without any available lab to test their product prior to the May 11, 2020 deadline.

      f.      Fifth, the Final ENDS PMTA Guidance also recommends that applicants perform product stability and shelf life testing. (FDA PMTA Guidance, 2019.) To my knowledge, there is no published industry guidance on proper testing protocols for evaluating the stability of ENDS products. In lieu of guidance specific to ENDS products, some companies are using industry guidance for stability testing of new drug substances and products. The duration of the stability testing should be sufficient to cover storage, shipment, and subsequent use, which will require a test that is at least 12 months in duration. (FDA, 2003).

      g.      Sixth, in the Final ENDS PMTA Guidance, FDA recommends that applicants conduct human clinical studies to study patterns of use (i.e., number of puffs per use, puff duration, puff intensity, frequency of use, and duration of use) and biomarkers of nicotine exposure and health outcome such as heart rate, blood pressure, and changes in lung function. (FDA PMTA Guidance, 2019 at pp. 24, 37-41.) These are known as "vaping topography" and "pharmacokinetic" studies. FDA states that "[n]onclinical studies alone are generally not sufficient to support a determination that permitting the marketing of a tobacco product would be appropriate for the protection of the public health." The shortest possible time frame over which such studies can be conducted, however, is 12 months, and 24 months is a more reasonable time estimate. This is the case because even a clinical study with a small cohort requires: (1) development of a study protocol; (2) review and approval by an institutional review board, or IRB; (3) execution of the study (which will often require subjects to stay overnight at the clinical laboratory facility for a period of approximately a week so that they can vape *ad libitum* and have measurements taken periodically of relevant biomarkers); (4) capture and presentation of the relevant data in a format appropriate for FDA review; and (5) analysis, interpretation, and

explanation of the data in a detailed written report.  Study participants typically participate in the study on a staggered basis, so data gathering typically occurs over a series of months or even years.

   h. Seventh, upon information and belief, there are six or fewer clinical laboratories in the United Sates with the expertise and experience to execute the type of vaping topography and pharmacokinetics studies recommended by FDA in the Final ENDS PMTA Guidance.  Further, one of these clinical laboratories will only work with large tobacco companies. I am in contact with these laboratories on a near-daily basis and, currently, the earliest any of these laboratories is even available to begin such a clinical study is not until the end of October 2019.

   i. Eighth, the Final ENDS PMTA Guidance recommends conducting behavioral studies that are nationally representative.  (FDA PMTA Guidance, 2019 at pp. 13, 46-47.)  Such a study could not be conducted in fewer than ten months because, to be truly nationally representative, such a survey would require a detailed sampling plan and thousands of participants.

   j. Ninth, any PMTA submission that complies with each of the recommendations set out by FDA in the Final ENDS PMTA Guidance is likely to be at least 50,000 pages in length and consist of a compilation of hundreds, if not thousands, of individual documents.  There exist consulting firms that specialize in compiling and organizing such submissions for FDAs review and are experienced with doing so in the drug and medical device contexts.  These consulting firms require that all relevant documents be provided to them at least three (3) months prior to the deadline for filing so that they have sufficient time to organize, collate, and create internal cross-references and links in the final submission package.  Any applicant would thus have to have all of its studies and testing completed and write-ups prepared and transmitted to such a consulting firm by February 11, 2020, in order for the submission to be sent to FDA by May 11, 2020.

21.     We expect the typical PMTA application process — from the initial planning stages to submission for FDA's substantive review — to span at least two years, if not more, for most vapor products.  The estimated costs are anticipated to be in the millions of dollars for each product.  All of this places a high premium on FDA providing predictability for the applicant in terms of what is required in the PMTA process so that the applicant can manage risk, as well as financial and time demands.

22.     Requiring applicants who have waited for the publication of the Final ENDS PMTA Guidance to now complete PMTAs on only a ten- or eleven-month time frame is not realistic and will likely lead to the submission of numerous incomplete and/or low-quality submissions.  The process applicants must go through to demonstrate that their vapor product is appropriate for the protection of public health is complex.  Both FDA and applicants will need sufficient time to resolve complicated issues associated with, among other things, protocols for testing and research. A lengthier time frame than a mere ten or eleven months is required for applicants to meaningfully explain their planned testing and study protocols to FDA during the initial planning phase of the PMTA process, receive feedback, and then execute on the planned tests and studies in their efforts to submit high quality PMTAs.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Dated:  August 28, 2019

Stacey M. Benson, Ph. D.

11

References

US Food and Drug Administration (FDA, 2003). Guidance for Industry Q1AQ(R2) Stability Testing of New Drug Substances and Products. https://www.fda.gov/media/71707/download

US Food and Drug Administration (FDA, 2016). Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems. Draft Guidance for Industry. May 5, 2016. https://www.fda.gov/media/97652/download

US Food and Drug Administration (FDA, PMTA Guidance 2019). Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems. Guidance for Industry. June 11, 2019. https://www.fda.gov/media/127853/download.

US Food and Drug Administration (FDA, PMTA Presentation 2019). Draft Guidance: Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems. Presentation by Paul Hart and Li-Lun Chen. Accessed June 2019. https://www.fda.gov/media/97881/download.

US Food and Drug Administration (FDA Reference Values, 2019). Use of Reference Values in the Toxicological Evaluation of Inhaled Tobacco Products. Accessed August 2019. https://www.fda.gov/media/124680/download.